Steven Ibarra, Esq. (SBN: 249642)
LAW OFFICES OF STEVEN IBARRA
6518 Greenleaf Avenue, Suite 28
Whittier, CA 90601
(562) 735-0828
(714) 582-0948 facsimile
sibarra@ibarralaw.com

Attorneys for Plaintiffs
MARLON STAGGS & CHRISTINE STAGGS

FILED

2012 FEB -6 PM 1:03

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY ________

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

MARLON STAGGS
CHRISTINE STAGGS
Plaintiffs,
vs.
MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.; RECONTRUST COMPANY, N.A.; COUNTRYWIDE FINANCIAL CORPORATION; COUNTRYWIDE HOME LOANS, INC.; COUNTRYWIDE HOME LOANS SERVICING, L.P. FKA BAC HOME LOAN SERVICING, L.P.; BANK OF AMERICA, N.A.; BAC HOME LOANS SERVICING L.P.; EDDIE AVAKIAN; LANDSAFE APPRAISAL SERVICES INC.; LANDSAFE, INC.; HEARN QUALITY ASSURANCE; MARK HEARN; TC APPRAISALS; C. BILL LEE; MARTEL LOFTSLLC; OMRI MERON; AMI REAL ESTATE, INC.; CITIBANK, N.A.; CERTIFICATE HOLDERS OF BEAR STEARNS ALT-A TRUST 2006-7 AS A SEPARATE UNKNOWN LEGAL ENTITY; STRUCTURED ASSET MORTGAGE INVESTMENTS II, INC; WELLS FARGO BANK, NATIONAL ASSOCIATION AND DOES 1-10.

Defendants.

Case No.: CV 12-1002 PA (VBKx)

**VERIFIED COMPLAINT**

**JURY TRIAL REQUESTED**

1) DECLARATORY RELIEF (VOID OR VOIDABLE CONTRACT)
2) UNJUST ENRICHMENT
3) WRONGFUL FORECLOSURE
4) TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS
5) PROMISSORY ESTOPPEL/CONSTRUCTIVE TRUST
6) SLANDER OF TITLE
7) DECLARATORY RELIEF/QUIET TITLE
8) EQUITABLE ESTOPPEL
9) VIOLATION OF 15 U.S.C. 1641(F)(2)
10) VIOLATION OF CAL. BUS. & PROF. CODE §17200
11) VIOLATION OF CAL. BUS. & PROF. CODE §11300 *et. seq.* (UNLAWFUL APPRAISAL)
12) INJUNCTIVE RELIEF
13) VIOLATION OF RESPA – 12 U.SC. §2601 *et. seq.*
14) DOE DEFENDENTS 1-10

# I. COMPLAINT

Plaintiffs MARLON STAGGS and CHRISTINE STAGGS hereby file this Complaint for VOID OR VOIDABLE CONTRACT, UNJUST ENRICHMENT, WRONGFUL FORECLOSURE, TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS, PROMISSORY ESTOPPEL/CONSTRUCTIVE TRUST, SLANDER OF TITLE, DECLARATORY RELIEF/QUIET TITLE, EQUITABLE ESTOPPEL, VIOLATION OF 15 U.S.C. 1641(F)(2), VIOLATION OF CALIFORNIA *BUSINESS & PROFESSIONS CODE* §17200, VIOLATION OF CALIFORNIA *BUSINESS & PROFESSIONS CODE* §11300 *et. seq.* (unlawful appraisal), INJUNCTIVE RELIEF and VIOLATION REAL ESTATE SETTLEMENT PRATICES ACT found at 12 U.S.C. §2601 *et. seq.* against ALL Defendants; MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.; RECONTRUST COMPANY, N.A.; COUNTRYWIDE FINANCIAL CORPORATION; COUNTRYWIDE HOME LOANS, INC.; COUNTRYWIDE HOME LOANS SERVICING, L.P. FKA BAC HOME LOAN SERVICING, L.P.; BANK OF AMERICA, N.A.; BAC HOME LOANS SERVICING L.P.; EDDIE AVAKIAN; LANDSAFE APPRAISAL SERVICES INC.; LANDSAFE, INC.; HEARN QUALITY ASSURANCE; MARK HEARN; TC APPRAISALS; C. BILL LEE; MARTEL LOFTS LLC; -OMRI MERON; AMI REAL ESTATE, INC.; CITIBANK, N.A., CERTIFICATE HOLDERS OF BEAR STEARNS ALT-A TRUST 2006-7 AS A SEPARATE UNKNOWN LEGAL ENTITY; STRUCTURED ASSET MORTGAGE INVESTMENTS II, INC; WELLS FARGO BANK, NATIONAL ASSOCIATION AND DOES 1-10. This lawsuit is in connection with the real property located at 6615 Melrose Avenue, Unit 2, Los Angeles, CA 90038 and the underlying mortgage loan (the "Subject Property.")

# II. STATEMENT OF THE CASE

1. Plaintiffs allege that this case stems from a transaction that began with collusion and possible joint venture between the developer Omri Meron, principal of MARTEL LOFTS LLC and AMI REAL ESTATE, INC, and the lender, COUNTRYWIDE HOME LOANS and

COUNTRYWIDE BANK N.A. as funder. COUNTRYWIDE further acted in collusion with BEAR STEARNS to create "paper" that could be securitized. This collusion led to a highly inflated appraisal with several violations of USPAP, California and federal laws. The appraisal was obtained from an unknown, possibly unlicensed appraiser C. Bill Lee, and an unknown and unregistered company known as TC APPRAISALS. COUNTRYWIDE and LANDSAFE secured a review appraisal from Mark Hearn of HEARN QUALITY ASSURANCE Inc. which simply signed off on the value that TC APPRAISALS had arrived at. COUNTRYWIDE's wholly owned subsidiary LANDSAFE is the party to who the appraisal fee was paid according to the HUD-1, and LANDSAFE was directing the activities of both TC APPRAISALS and HEARN QUALITY ASSURANCE. These appraisals were concealed from the Staggs and were only obtained in the last two months after significant investigation. The loan documents show that the Staggs did not receive any real estate or mortgage disclosures, including affiliated business arrangement between the parties.

2. Plaintiffs allege that Defendants are simply managers and third-party agents, of the mortgage loan and have no ownership. Lawsuits show that although CITIBANK and BANK OF AMERICA assert they are acting as agents of the Certificate holders of BEAR STEARNS Alt-A Mortgage Backed Securities 2006-7 trust, those Certificate holders have accused them of the very practices named herein. A conflict that simply does not allow for CITIBANK, BANK OF AMERICA or any other party herein to claim rights as agent or representative of the other party. The Certificate holders are suing the managers for damages and rescission.[1] So contrary to the representation that Trustee CITIBANK, servicer BANK OF AMERICAN.A. and its subsidiary, RECONTRUST, are acting in the interest of the Certificate holders, lawsuits against them by Certificate holders prove otherwise. These suits create judicial estoppel and effectively tie the hands of these parties to proceed as agents. These managers are hiding behind the complexities of the mortgage finance system, and Defendants brazenly attempt to dupe Plaintiffs

[11] http://www.cohenmilstein.com/media/pnc/4/media.704.pdf

and state courts into believing that they have the right to collect on a debt in which CITIBANK and/or BANK OF AMERICA have no ownership interest and which the Certificate holder whom they claim to represent are demanding rescission of the contracts. In an attempt to further their fraudulent scheme and create the air of propriety surrounding their debt collection efforts, Defendants CITIBANK and/or BANK OF AMERICA, RECONTRUST and other unknown DOE Defendants have resorted to "papering the file" by fabricating an "Corporate Assignment of Deed of Trust," employing individuals who have no authority or personal knowledge of the facts to which they attest, and falsely representing to Plaintiffs and ***to the Court*** that they have the right to collect Plaintiffs' mortgage payments and take Plaintiffs' property away if they do not. Not only is Defendants' conduct a *criminal violation* of California's Mortgage Fraud Statute, Cal. Penal Code §532 (f)(a)(4)[2], and an affront to long-standing property laws, but their reliance on fabricated and forged documents undermines the integrity of the judicial system. Through this action, Plaintiffs seek to stop Defendants' fraudulent practices.

3. The Staggs are further prepared to prove at trial that BANK OF AMERICA N.A. and CITIBANK N.A. are intentionally concealing the Certificate holders due to the fact that the Certificate holders are not in agreement with the practices employed by BANK OF AMERICA, CITIBANK, or BEAR STEARNS as they righteously believe that their best interests are not being served by the very same individuals and entities that owe them, a fiduciary duty. This is important and a material aspect of Plaintiffs' claims because these actions constitute an intentional interference with contractual relations which have caused Plaintiff's harm.

4. Further, the underlying mortgage loan is riddled with so much collusion, fraud, adhesion and, more importantly, is based on an inflated and fraudulent appraisal such that it renders the contract void or voidable. The main Defendants, who invariably will be represented by the same law firm (despite the obvious and flagrant conflict of interest. Through this lawsuit,

[2] Cal. Penal Code §523(f)(a) provides that "a person commits mortgage fraud if, with the intent to defraud, the person does any of the following…(4) files or causes to be filed with the recorder of any county in connection with a mortgage loan transaction any document the person knows to contain a deliberate misstatement, misrepresentation, or omission."

Plaintiffs will expose all of the Defendants' fraudulent, collusive and unfair business practices from the *inception* of the contract to the current "servicing" of same.

## III. JURISDICTION, VENUE AND GOVERNING LAW

5. This Court has subject matter jurisdiction to hear this case pursuant to 28 U.S.C. §1332 (diversity of parties) and 28 U.S.C. §2201(a) (declaratory relief). Subject matter is further conferred upon by 28 U.S.C. §1331 because it involves federal questions regarding interpretation and proper application of the Real Estate Settlement Procedures Act, 12 U.S.C. §2601, *et. seq.* ("RESPA").

6. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367.

7. Venue is proper in the Los Angeles branch of this Court pursuant to 28 U.S.C. §1391(b)(2) and local rules, because the subject Real Property is located in Los Angeles County, California.

8. The Deed of Trust is governed by the laws of the State of California and federal law; the relevant Pooling and Servicing Agreement and Trust Agreement are governed by the laws of the State of New York.

## IV. THE PARTIES

9. Plaintiff MARLON STAGGS is an individual residing at 1433 Carroll Avenue, Los Angeles, CA 90026 at all times relevant to this Complaint.

10. Plaintiff CHRISTINE STAGGS is an individual residing at 1433 Carroll Avenue, Los Angeles, CA 90026 at all times relevant to this Complaint.

11. Defendant MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.

("MERS") is a corporation organized and existing under the laws of the state of Delaware with its principal place of business in Reston, Virginia. At all times relevant, MERS was **not** registered to do business in the State of California and yet was engaging in the business of assigning mortgages in the State of California.

12. Defendant RECONTRUST COMPANY, N.A. ("RECONTRUST") is a Texas company with its principal place of business in California. The FDIC's National Information Center states it is a Non-Depository Trust Company ("Accepts and executes trusts, but does not issue currency") and Federal Reserve Member regulated by the OCC and engaged in "trust, fiduciary and custody activities." RECONTRUST is a wholly owned subsidiary of Defendant Bank of America, N.A. and at all times relevant is doing business in the state of California.

13. Defendant CITIBANK, N.A. is a national bank regulated by the Office of the Comptroller of the Currency with its principal place of business in Sioux Falls, South Dakota. CITIBANK purports to act as Trustee for the Holders of BEAR STEARNS Alt-A Trust 2006-7, Mortgage Pass-Through Certificates, Series 2006-7, and is sued herein in that capacity as well as individually by virtue of independent acts apart from its Trustee duties.

14. Defendant BEAR STEARNS ALT-A TRUST 2006-7 is a separate unknown legal entity that has been concealed from the Plaintiffs. It holds an unverified claimed state of incorporation of Delaware, CIK 0001378876, with a mailing address of 383 Madison Avenue, New York, NY 10179.

15. The Certificate holders for BEAR STEARNS ALT-A TRUST 2006-7 are unknown investors of which hold a fractional interest in the principal and the interest related to this loan. WELLS FARGO Bank N.A. as securities administrator has the complete records of all Certificate holders and must produce those records to properly enjoin them in this matter.

16. Defendant BANK OF AMERICA, N.A. ("BofA") is a national bank regulated by the Office of the Comptroller of the Currency with its principal place of business in Charlotte, North Carolina, and successor by merger to BAC Home Loans Servicing, LP ("BAC

Servicing"), a Texas limited partnership with its principal place of business in California formerly doing business as COUNTRYWIDE Home Loans Servicing, LP. BANK OF AMERICA acquired COUNTRYWIDE Home Loans Servicing, LP on or about July 1, 2008 after which time it was doing business as BAC Home Loans Servicing, LP until July 8, 2011, when it merged into Bank of America, N.A. According to California's public records, BAC Servicing is an inactive and, in fact, "cancelled" foreign limited partnership. At all times relevant, BofA was doing business in the state of California, purporting to act on behalf of the Defendant CITIBANK.

17. Defendant LANDSAFE, INC. is a subsidiary of Bank of America, N.A, and is registered to do business in the State of California with its principal place of business located in Westlake Village, CA.

18. Defendant COUNTRYWIDE HOME LOANS SERVICING LP ("COUNTRYWIDE Servicing") is a Texas limited partnership directly owned by COUNTRYWIDE GP, Inc. and COUNTRYWIDE LP, Inc., each a Nevada corporation and a direct wholly owned subsidiary of COUNTRYWIDE Home Loans. COUNTRYWIDE GP, Inc. owns a 0.1% interest in COUNTRYWIDE Servicing and is the general partner. COUNTRYWIDE LP, Inc. owns a 99.9% interest in COUNTRYWIDE Servicing and is a limited partner. Its principal place of business is located at 7105 Corporate Drive, Plano, Texas 75024 FKA . BAC HOME LOANS SERVICING L.P. 100 North Tyron Street Charlotte, NC 28255

19. Defendant COUNTRYWIDE FINANCIAL CORPORATION and Subsidiaries (which includes its wholly-owned subsidiary, COUNTRYWIDE Home Loans, Inc. ("CHL"), and COUNTRYWIDE Home Loans Servicing L.P., a wholly owned subsidiary of CHL ("COUNTRYWIDE DEFENDANTS") is national bank regulated by the

20. Defendant EDDIE AVAKIAN is an individual residing in Los Angeles County who was at all times relevant herein was the loan broker associated with the Staggs' lawsuit.

21. Defendant BAC HOME LOANS SERVICING L.P. is a Delaware corporation with its principal place of business in Virginia.

22. Defendant LANDSAFE APPRAISAL SERVICES INC. is a subsidiary of Bank of America, N.A, and is registered to do business in the State of California with its principal place of business located in Westlake Village, CA.

23. Defendants HEARN QUALITY ASSURANCE and MARK HEARN (the "Hearn Defendants") are located at 175 E. Mountainview Street Long Beach CA 90805 with the former holding an active Corporation Status within the State of California. At all times relevant herein, the Hearn Defendants prepared a purported appraisal of the subject property.

24. Defendants TC APPRAISALS and C. BILL LEE, entities unknown, are unregistered California business entities and/or individuals. At all times relevant herein, TC APPRAISALS and C. BILL LEE prepared an appraisal relating to the subject property.

25. Defendants OMRI MERON and MARTEL LOFTSLLC - a California Limited Liability Company, located at 8342 1/2 West 3rd Street Suite A Los Angeles CA 90048, is the builder/seller of the subject property.

26. Defendant STRUCTURED ASSET MORTGAGE INVESTMENTS II, INC., form of entity unknown, is located at 383 Madison Avenue New York, New York 10179, and is an active Delaware Foreign Business Corporation.

27. Defendant WELLS FARGO BANK, NATIONAL ASSOCIATION, is the Master Servicer-Securities Administrator of the underlying trust and is located at Sixth Street and Marquette Avenue Minneapolis, Minnesota 55479, Attention: BEAR STEARNS Alt-A Trust 2006-7 WELLS FARGO Bank, N.A. File Number 3762 .

28. Plaintiffs do not know the true names and capacities of the DOES 1-10 defendants sued herein as Does 1-10, inclusive, and therefore Plaintiffs sue said defendants by the foregoing

fictitious names. When the true names and capacities of these defendants become known, Plaintiffs will amend this Complaint to include such true names and capacities and, if necessary, will seek leave to amend to add additional charging allegations against them.

29. At all times herein mentioned, unless otherwise expressly stated, each of the Defendants sued herein was the affiliate, agent, employee and/or principal of each of the remaining Defendants and was at all times acting within the purpose and scope of such affiliation, agency and/or employment.

30. The Staggs therefore seek a declaration under the authority of 28 U.S.C. §2201(a) and §2202 that the title to the subject Property is vested in Marlon and Christine Staggs alone and that the Defendants herein, and each of them, their parents, subsidiaries, agents and assigns be declared to have no estate, right, title or interest in the subject Property and that said Defendants, and each of them, are forever enjoined from asserting any estate, right, title or interest in the subject property adverse to Marlon and Christine Staggs.

## V. JURY TRIAL DEMANDED

31. Plaintiffs herein demand a jury trial.

32. Plaintiffs bring this action against these Defendant and DOES 1 through 10, inclusive, for attempting to sell Plaintiff's property and deprive Plaintiffs of their residence without a lawful claim to the Property. Plaintiff seeks to clear their title of any and all of Defendant's purported claims.

## VI. FACTS COMMON TO ALL CAUSES OF ACTION

33. A mortgage transaction has many moving parts. It is highly regulated for good reason. The fundamental foundation of the transaction is an arm's length sale, a valid appraised value, and consideration paid. The transaction is a contract, and inherent in all contracts is a duty of good faith and fair dealing. It is clear in this case that collusion, corruption, and concealment were the root of the contract. Had the Staggs known all of the material facts, they would not have entered into the contract.

34. The Staggs, at all time relevant to this action, are not in default under the terms of their contracts because:

1) the defendants breached the terms of their contracts prior to their having ceased making payments on their loan (and possibly prior to their having made their first payment), and/or;
2) the servicer and/or insurer of the loan continued to make their payments on their account to the owner/holder of their Note (and therefore the owner/holder never experienced default) and;
3) the interest promised to the investment tranche wherein this loan is pledged has never suffered any default. The pass through rate for this investor is only .46%. The Staggs have paid well in excess of all interest paid as pass through to investors;
4) Bank of America, as servicer, and CITIBANK as Trustee have failed to follow the loss mitigation directives of the investors and insurers to whom they have a contractual and fiduciary duty.
5) BANK OF AMERICApromised the Staggs assistance if they would default on the loan, thereby BANK OF AMERICA ordered them to default on the loan.

35. The origins of this transaction sound in fraud and therefore the transaction is void or voidable.

36. The Staggs have already paid full consideration for the property based on its *true* value of $700,000.

37. The parties never had a legal transaction as a mortgage and real estate transaction that requires all disclosures be provided and all application and disclosures documents must be signed. In this case it is clear that the Defendants' do not possess any such signed documents.

38. The Staggs' Note is purported to be assigned, traded, pledged, sold and/or securitized one or more times prior to the time the Notice of Trustee's Sale was recorded on the

subject property. These transfers and assignments or proof thereof have not been presented only a fraudulent endorsement in blank.

39. According to the Pooling and Servicing Agreement found on the SEC website the Staggs' Note was purported to be sold and transferred from lender COUNTRYWIDE BANK, N.A. to COUNTRYWIDE Home Loans, LLC, and was later purportedly sold through EMC Mortgage Corporation to Structured Asset Investments II Inc. and sold/or transferred to the BEAR STEARNS ALT-A TRUST 2006-7, MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-7 (the "Trust"). If all of these transfers were recorded on the MERS system, MERS should have no issues producing the complete record on the MERS system. After all, they claim to track the beneficial interest in the Note.

40. The investors have not been harmed as the spread test and monthly investor report shows. The investors will however be harmed through foreclosure and liquidation due to the conduct of the agents they chose to allow to manage the assets and remain silent in this matter.

41. Documents produced in the purported response to a RESPA letter show fraud and unclean hands on behalf of the Defendants as the Interest First Only Note sent to the Staggs by RECONTRUST has an endorsement stamp from COUNTRYWIDE Home Loans to COUNTRYWIDE BANK, and COUNTRYWIDE Bank to blank, while at the exact same time Blank Rome as representative for BANK OF AMERICA sent the Staggs the Interest First Only Note without the endorsement stamp in response to the RESPA qualified written response. **SEE** EXHIBIT 18A &18B. This stamp would have been required to be on the Note at the time the trust closed. RECONTRUST, using this photo-shopped stamp, filed a Corporate Assignment of Deed of Trust from MERS to CITIBANK as Trustee for BEAR STEARNS Alt-A 2006-7 trust with the County Recorder. **SEE** EXHIBIT 20

42. A retained forensic auditor discovered it is an exact replica found on other foreclosure case files, and it appears to be photo-shopped in for the purposes of covering up violations of New York trust law, REMIC IRS laws, and violations of the specific, underlying Pooling and Servicing Agreement.

43. The Staggs assert none of the Defendants is the owner of the Staggs' Note, or hold a complete chain of assignments, even on the MERS system.

44. The Staggs assert the Defendants do not have the authority to foreclose by virtue of misrepresentations to the investors and insurers and related lawsuits pending against them.

45. The Staggs assert the Defendants have abandoned their fiduciary duty and contractual obligations to investors, which render those contracts void and meaningless.

46. The records are missing or have been altered, transfers were never consummated, and counterclaims between the parties including repurchase or "put back" claims are pending. If insurance claims are made the insurer has been pledged rights regarding the property. All of these issues make the issue of ownership anything but clear.

47. The Staggs have repeatedly attempted to contact BANK OF AMERICA, N.A., as the loan servicer, obtain information and assistance and have repeatedly been denied. In fact BAC HOME LOANS SERVICING, LP FKA BANK OF AMERICA, N.A. and WELLS FARGO, N.A. as Master Servicer, have intentionally interfered with the Staggs attempt to perform under the contract.

48. The originator COUNTRYWIDE HOME LOANS, COUNTRYWIDE BANK, LANDSAFE, and Omri Meron – MARTEL LOFTS LLC and AMI REAL ESTATE initial collusion caused the Staggs financial harm and ruined their credit.

**INFLATED APPRAISAL**

49. COUNTRYWIDE HOME LOANS, INC. knew of the inflated appraisal and ordered a review appraiser to justify the amount. The Staggs never received the original appraisal even though they repeatedly asked for it before and after closing. COUNTRYWIDE actively concealed the appraisal. In response to a Qualified Written Request, a review appraisal was sent.

The Staggs called the review appraiser and asked if he had the original appraisal and received it on January 28, 2012. The COUNTRYWIDE Defendants failed to inform the Staggs of their actual knowledge that the property value did not appraise to support the underlying loan. The Staggs had no choice of lender or appraiser as the builder's collusion with COUNTRYWIDE and COUNTRYWIDE's mandate to use their wholly owned LANDSAFE for appraisal made it impossible to go elsewhere for services.

50. For insurance purposes, the appraisal tolerance is 10% and the appraisal breaches this tolerance by at least 25% based on the true value at time of sale. The Staggs intend to prove this using an expert Appraisal auditor.

51. The comps secured by the Staggs on January 24, 2012 shows that appropriate comps were ignored, and inappropriate comps were used in an attempt to justify the value to create a LTV that would enable COUNTRYWIDE to sell the loan into securitization as A paper. The appraisal did not conform to USPAP standards in all of the following ways:

(1) The appraisal was collusive and not independent;
(2) The appraiser was given a predetermined number to meet;
(3) The appraiser used inappropriate comparables;
(4) The appraiser ignored appropriate comparables;
(5) The appraiser used units that had not closed as comparables.

52. The Staggs relied on the implied promise that the property was worth $1,450,000 and have suffered actual damages of:

a. A down payment of $311,072.58 plus payments of $373,576.91 and property improvements of over $75,000. The total actual damage claim is $759,649.49.

b. This damage is due to the true value of the property is not $1,450,000 but only $700,000.

c. If the Staggs were to sell the property they would owe $1,160,000 for a negative equity of $460,000 even though the Staggs have already invested $759,649.49. Additional damages include loss of good credit and name as Marlon Staggs credit score was

750-778 and Christine Staggs' score was 762-793. This has severely damaged their score.

53. COUNTRYWIDE HOME LOANS and COUNTRYWIDE BANK N.A. allowed the Staggs to go ahead and buy this property with actual knowledge of the inflated appraisal. BEAR STEARNS securitized this loan with actual knowledge of the inflated appraisal.

54. COUNTRYWIDE HOME LOANS, COUNTRYWIDE BANK, LANDSAFE and MARTEL LOFTS and AMI REAL ESTATE, INC. acting in collusion, told the Staggs the property was worth $1,450,000 and the Staggs purchased the property and COUNTRYWIDE made the loan. The Staggs trusted all of them and now is ruined as a consequence.

55. The Staggs have never knowingly or intentionally waived any of their rights under their mortgage contracts or under the law and have pursued all administrative or non-judicial remedies available to them prior to filing suit. MARTEL LOFTS included an arbitration clause in the contract, the Staggs claim that is an unenforceable covenant for the same reason the entire contract is unenforceable.

56. All facts asserted in the Complaint are incorporated in each and every cause of action as if fully set forth therein.

**COUNT ONE**

**DECLARATORY RELIEF (VOID OR VOIDABLE CONTRACT) AS TO BANK OF AMERICA, N.A. ("BOA"), COUNTRYWIDE FINANCIAL CORPORATION ("CFC"), COUNTRYWIDE HOME LOANS, INC. ("CHL"), AND COUNTRYWIDE HOME LOANS SERVICING, L.P. FKA BAC HOME LOANS SERVICING L.P., LANDSAFE TITLE INC., LANDSAFE APPRAISAL SERVICES INC., EDDIE AVAKIAN, C. BILL LEE- TC APPRAISALS, MARK HEARN, HEARN QUALITY ASSURANCE INC., OMRI MERON- MARTEL LOFTSLLC - OMRI MERON, AMI REAL ESTATE, INC., STRUCTURED ASSET MORTGAGE INVESTMENTS II INC. ("SAMI"), RECONTRUST, CITIBANK N.A., BEAR STEARNS ALT-A TRUST 2006-7 ("BSALT 2006-7"),**

**CERTIFICATE HOLDERS OF BSALT 2006-7, BEAR STEARNS & CO INC FKA J.P. MORGAN SECURITIES INC., WELLS FARGO BANK, N.A. ("WELLS"), MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., DOES 1-10**

57. Plaintiffs hereby incorporate by reference each and every one of the preceding paragraphs as if the same were fully set forth herein.

58. The builder/developer in this case, MARTEL LOFTS LLC principal OMRI MERON and AMI REAL ESTATE, included unconscionable, coercive, illegal, and frankly shocking provisions in the purchase contract. Those provisions include a strict requirement to use the Sellers preferred lender, or risk forfeiting all deposit funds. A requirement to share loan application information with sellers prefer lender with no plausible explanation as to why that would be necessary. **SEE** EXHIBIT 1

59. The contract contains a requirement to not only use a specific lender, but also a specific branch, **100 Wilshire Blvd. suite number 600, Santa Monica, CA 90401, at phone number (310) 434-1808, Eddie Avakian**, and a specific loan officer, **Eddie Avakian,** to process the loan.

60. COUNTRYWIDE HOME LOANS, COUNTRYWIDE N.A., LANDSAFE, and loan officer Eddie Avakian, failed to provide the Staggs with any required California or Federal Truth in Lending Disclosures in the processing of the loan application as evidenced by the documents produced in response to the RESPA qualified written request. **SEE** EXHIBITS 3, 7, 8, 9, 10, 11, 12, 13, 14, 19.

61. COUNTRYWIDE HOME LOANS, COUNTRYWIDE N.A., LANDSAFE, and loan officer Eddie Avakian, failed to provide the appraisal. **SEE** EXHIBIT 28.

62. These breaches were heightened by the fact that the Staggs would not be at the loan closing and instead had authorized a representative to sign for them. **SEE** EXHIBIT 4

63. The Omri Meron – MARTEL LOFTS contract itself demands that the Buyer accept whatever loan COUNTRYWIDE offered even if it was adjustable as opposed to a fixed rate no matter what the terms offered. Although the Staggs were captive due to this collusion with COUNTRYWIDE, COUNTRYWIDE *never* provided the Staggs good faith estimates within three days of making loan application, good faith estimates and truth in lending disclosures, affiliated business arrangements between the builder/developer and COUNTRYWIDE, or between the appraiser and COUNTRYWIDE through its wholly owned subsidiary LANDSAFE. COUNTRYWIDE never provided a copy of the appraisal or a signed set of documents at closing.

64. Due to all of the foregoing, a legal and enforceable contract was never entered into.

65. The joint purchase agreement and escrow instructions (**SEE** EXHIBIT 1) contains the following collusive and unconscionable provisions based on that collusion:

Page 3 – INSTRUCTIONS (EMPHASIS ADDED)

A) FINANCING: Buyer to obtain a new first and second deed of trust loan (as applicable) **in favor of Sellers Preferred Lender-COUNTRYWIDE HOME LOANS (specifically located at 100 Wilshire Blvd. suite number 600, Santa Monica, CA 90401, at phone number (310) 434-1808 with the loan officer of Eddie Avakian,** herein referred to as Seller's Preferred Lender) –OR- a Lender of Seller's Choice to be obtained at Buyer's sole expense, given to secure a note in the principal amount(s) as set forth in Page here of, per its terms. In the event that Buyer is unable to qualify for a Fixed Rate Mortgage, **Buyer shall accept an Adjustable Rate Mortgage** (provided he can qualify for same). Buyer's execution of the loan documents shall evidence their full approval of the terms and conditions contained therein.

IF ON THE SAME DATE THAT THE BUYER SIGNED THIS AGREEMENT, BUYER APPLIES FOR THE NEW FIRST AND SECOND TRUST DEED LOAN (AS APPLICABLE) FROM SELLERS PREFERRED LENDER-OR-A LENDER OF SELLERS CHOICE, BUYER'S OBLIGATION TO CONSUMMATE THIS TRANSACTION SHALL BE CONTINGENT UPON BUYER'S ABILITY TO

SECURE FINANCING OF THE PROPERTY FROM SAID LENDER. BUYER FURTHER ACKNOWLEDGES THAT THE CONSUMMATION OF THIS ESCROW MAY BE SUBJECT TO AND CONTINGENT UPON THE "PRE-SALE" REQUIREMENTS OF LENDER, IF ANY.

BUYER COVENANTS TO PROVIDE SUCH PERSONAL FINANCIAL STATEMENTS OR OTHER CREDIT INFORMATION REQUIRED BY SELLERS PREFERRED LENDER-OR-A LENDER OF SELLERS CHOICE, WITHIN THREE (3) DAYS FROM THE DATE HERE OF. IF THROUGH NO FAULT OF BUYER, BUYER IS UNABLE TO OBTAIN SUCH A LOAN FROM SELLERS PREFERRED LENDER-OR- A LENDER OF SELLERS CHOICE, AND THIS ESCROW SHALL TERMINATE. ESCROW HOLDER SHALL RETURN TO BUYER ANY DEPOSIT GIVEN BY BUYER TO ESCROW HOLDER, LESS DOCUMENT AND PROCESSING FEES, IF ANY, TOWARD THE PURCHASE OF THE PROPERTY. UPON ESCROW HOLDERS RECEIPT OF SIGNED MUTUAL CANCELLATION INSTRUCTIONS, BUYER AND SELLER SHALL BE RELIEVED OF ANY FURTHER LIABILITY AND/OR OBLIGATION TO THE OTHER UNDER THIS AGREEMENT.

FINANCING FROM THIRD-PARTY LENDERS: IF BUYER ELECTS TO APPLY FOR THIRD-PARTY FINANCING (FINANCING OTHER THAN WITH SELLERS PREFERRED LENDER-OR-A LENDER OF SELLERS CHOICE), **THEN BUYER IS OBLIGATED TO CONSUMMATE FINANCING AN ESCROW WILL NOT BE CONTINGENT UPON FINANCING**, NOR WILL ESCROW BE EXTENDED FOR THAT PURPOSE. **BUYER (S) WHO FAIL TO QUALIFY FOR OR RECEIVE THIRD-PARTY FINANCING AND FAIL TO CLOSE ESCROW FOR THAT REASON WILL FORFEIT THE AMOUNT OF THE DEPOSIT AS LIQUIDATED DAMAGES**, (AS MORE SPECIFICALLY SET FORTH THEM PURSUANT TO THE TERMS AND CONDITIONS OF THAT CERTAIN PARAGRAPH ENTITLED "LIQUIDATED DAMAGES/ARBITRATION" CONTAINS HERE AND).

**ESCROW HOLDERS HEREBY SPECIFICALLY AUTHORIZED AND INSTRUCTED NOT TO FORWARD ANY DOCUMENTS TO ANY THIRD PARTY LENDER, INCLUDING, BUT NOT LIMITED TO: THIS JOINT PURCHASE AGREEMENT AND ESCROW INSTRUCTIONS, A COPY OF THE BUYERS EARNEST MONEY DEPOSIT AND/OR RECEIPT, OR THE PRELIMINARY TITLE REPORT AND/OR ANY OTHER DOCUMENTS WITHOUT THE EXPRESS WRITTEN CONSENT OF THE SELLER HEREIN**. IN ADDITION BUYER HEREBY AUTHORIZES AND INSTRUCTS THIRD-PARTY LENDER, IF ANY, TO FULLY DISCUSS EVERY ASPECT OF THE BUYERS LOAN, INCLUDING BUT NOT LIMITED TO: THE TERMS, CONDITIONS, AND STATUS OF THE NEW LOAN WITH SELLER, ESCROW HOLDER, SELLERS PREFERRED LENDER-OR-A LENDER OF SELLERS CHOICE AND/OR SELLERS LISTING BROKER, IF ANY. FAILURE OF SAID THIRD PARTY LENDER TO COOPERATE WITH THE INSTRUCTION SHALL GIVE THE SELLER THE RIGHT, BUT NOT THE OBLIGATION, TO CANCEL THIS TRANSACTION.

A BUYER WHO CHOOSES TO APPLY FOR THIRD-PARTY FINANCING MUST NOTIFY SELLERS LISTING BROKER, IF ANY, AND SELLER'S PREFERRED LENDER OR A LENDER OF SELLERS CHOICE IN WRITING WITHIN FORTY EIGHT (48) HOURS OF SELLER'S ACCEPTANCE OF THIS AGREEMENT, AND MUST OBTAIN A WRITTEN UNCONDITIONAL LENDING COMMITMENT FROM THE THIRD-PARTY LENDER WITHIN 20 DAYS AFTER THE DATE HERE OF. IF BUYER DOES NOT NOTIFY SELLERS LISTING BROKER, IF ANY, AND NOTIFY SELLERS PREFERRED LENDER -OR A LENDER OF SELLERS CHOICE IN WRITING WITHIN FORTY EIGHT (48) HOURS OF THE DATE HEREOF OR IF BUYER FAILS TO OBTAIN THE LOAN COMMITMENT AS DESCRIBED IN THIS SUBPARAGRAPH, THEN WITHOUT ANY REQUIREMENT OF FURTHER NOTICE OR OTHERWISE: BUYER SHALL BE DEEMED TO BE IN DEFAULT UNDER THIS AGREEMENT AND WILL FORFEIT THE AMOUNT OF THE DEPOSIT AS LIQUIDATED DAMAGES (AS MORE SPECIFICALLY SET FORTH AND PURSUANT TO THE TERMS AND CONDITIONS OF THAT CERTAIN

PARAGRAPH ENTITLED "LIQUIDATED DAMAGES/ARBITRATION" CONTAINED HEREIN TO SELLER IN THIS AGREEMENT SHALL BE TERMINATED AT SELLER'S UNILATERAL OPTION.

**THIS TRANSACTION IS NOT CONTINGENT UPON BUYER'S ABILITY TO RETAIN THE INTEREST RATE (FIXED OR ADJUSTABLE), AND/OR OTHER LOAN TERMS INCLUDING BUT NOT LIMITED TO LOAN ORIGINATION FEES QUOTED AT THE TIME OF LOAN APPROVAL, A BUYER WILL BE REQUIRED TO PAY THE INTEREST RATE CHARGED BY THE FINANCING ENTITY AT THE CLOSE OF ESCROW.**

ONCE BUYER HAS DEPOSITED ESCROW THE "LOAN COMMITMENT" PREVIOUSLY DESCRIBED HEREIN, BUYER SHALL NOT BE ENTITLED TO APPLY OR OBTAIN ANY MODIFIED, ADDITIONAL AND/OR NEW LOAN COMMITMENT FROM ANY OTHER FINANCING ENTITY OR OTHER SOURCE, IF THE APPLICATION OR FUNDING OF THE NEW LOAN WOULD, IN SELLER'S SOLE JUDGMENT, DELAY THE CLOSE OF ESCROW.

**IN THE EVENT THAT BUYER OBTAINS A LOAN FROM A THIRD PARTY LENDER, BUYER WILL PROVIDE A COPY OF ALL CREDIT AND APPRAISAL DOCUMENTS TO SELLERS PREFERRED LENDER, OR A LENDER OF SELLERS CHOICE WITHIN TEN (10) DAYS AFTER THE DATE HEREOF**.

Seller warrants and represents that he has no equity interest in Sellers preferred lender-or any other Lender of Sellers Choice.

66. Although the Seller, MARTEL LOFTS LLC warrants and represents that he has no equity interest in lender, the Staggs investigation reveals that a joint venture may exist. Whether or not this is true, other benefits were conferred on Omri Meron- MARTEL LOFTS under this arrangement. These benefits were a collusive transaction which guaranteed him that the lender of his insistence, COUNTRYWIDE would appraise the property at the value he wanted to sell them for. Based on information and belief, Meron –MARTEL LOFT or affiliated company AMI

REAL ESTATE, took a kick back of commissions, premiums, and/or settlement fees, for steering the Staggs to a specific lender and loan officer.

67. The collusion led to two (2) inflated appraisals with multiple violation of USPAP standards, California and Federal law, which were concealed from the Staggs. C. Bill Lee -TC APPRAISALS (may not exist) and Mark Hearn -HEARN QUALITY ASSURANCE (review appraisal) both simply justified the contract value of $1,450,000 after being given a pre-determined number to hit. LANDSAFE controlled the acts by virtue of affiliated controlled business agreements.

68. After origination under this coercive arrangement, the Staggs are now stuck with an arrangement that they did not bargain for. COUNTRYWIDE was simply creating and bundling a security they could sell and securitize on the secondary market.

69. If a business owner contracted with a vendor to supply ongoing goods and services and used its good name to lure in customers, then immediately sold the contracts to another vendor with a bad reputation, or a vendor that the business owner knew would not give him good service and would in fact impede his ability to do business, that business owner would never have signed the contract had they known the true nature of the contract. The contract is legally unenforceable, or void at inception.

70. The vendor in this case is COUNTRYWIDE, who committed fraud and a violation of inherent good faith and fair dealing when they included a provision into the contract which locked the Staggs in and trapped them no matter what COUNTRYWIDE did with the contract. COUNTRYWIDE knew the Staggs would not agree to the contract had they known the true nature of the contract and the "actual vendor" or securitization model they would be stuck dealing with and at the mercy of. The Staggs would cancel the contract or would have never signed the contract.

71. Although the language within the four corners of the contract contains provisions for successors and assigns, it does not fully describe securitization, a fractional ownership of the

loan, insurances, and other provisions which may cause harm to the borrower during the fulfillment of the contract.

72. In this case, harm was caused because the immediate successor to the contract at inception was not revealed as the true party in interest making it difficult for the Staggs to contact them directly and discuss the fact that the servicer BANK OF AMERICA Home Loan Servicing FKA BANK OF AMERICA N.A. was intentionally interfering with the Staggs attempt to perform under the contract.

73. Defendant BEAR STEARNS caused harm to the Staggs when incentivizing COUNTRYWIDE to produce "paper" that they could sell of the secondary market. It was not good paper they demanded, just paper. In fact, lawsuits show that BEAR STEARNS systematically ignored inflated appraisals and loan files with missing or defective documents, as is in evident in this loan file. BEAR STEARNS, to create BEAR STEARNS trust BSALT 2006-7, was hungry for the mortgage contracts to fill the subprime securitizations and did not care about the quality of the loans. This is never revealed to the borrower. The originator has this knowledge and originates paper that looks good and is not good. To do this, the originator, COUNTRYWIDE, obtains a collusive and coercive appraisal for a value that was well beyond the actual value of the property. The Staggs cannot sell or refinance; another trap caused by COUNTRYWIDE and BEAR STEARNS and the collusion between them.

74. Plaintiffs believe that substantial additional evidentiary support for the allegations set forth below will be developed after a reasonable opportunity for discovery. Despite the exercise of reasonable diligence, Plaintiffs could not have reasonably discovered the untrue statements at an earlier time. First Plaintiff had to obtain the review appraisal from BANK OF AMERICA as servicer through a RESPA qualified written request, which led to contact with HEARN QUALITY ASSURANCE, who provided the original appraisal to the Staggs.

**CERTIFICATE HOLDERS OF BEAR STEARNS ALT-A 2006-7**

75. The question of whether or not the *original* contracts for the trust including the Pooling and Servicing Agreement, that controls the authority of the trustee for BEAR STEARNS ALT-A 2006-7 trust to act on behalf of the Certificates holders of that trust, is still valid is in serious question. The investors have challenged the parties in various lawsuits filed in New York and California.

76. In a consolidated class action against BEAR STEARNS and Structured Asset Mortgage Investments, the Public Employees' Retirement System of Mississippi, New Jersey Carpenters Health Fund, along with plaintiff Boilermaker Blacksmith National Pension Trust ("Securities Plaintiffs), brought a securities class action for damages and rescission. [3]

77. Investors have claimed they were the victims of reliance on material misstatements, inflated appraisals, and servicing breaches, against COUNTRYWIDE, BEAR STEARNS, and various related subsidiaries. Statements from this case include:

78. "The Offering Documents contained **untrue statements of material fact**, or omitted to state material facts necessary to make the statements therein not misleading, regarding: (1) the underwriting and **appraisal standards** purportedly used in connection with the origination of the underlying mortgages; (2) the **true loan-to-value ratios used to qualify bo**rrowers; (3) the amount of credit support for each Offering; (4) **the description of the mortgage servicer's duties and obligations;** and (5) the ratings of the Certificates."

79. The underlying mortgages were based on collateral appraisals that overstated the value of the underlying properties. ...... traditionally, the originator was economically vested in establishing the creditworthiness of the borrower and the true value of the underlying property through appraisal before issuing the mortgage loans. In securitizations where the originator immediately sells the loan to an investment bank, it does not have the same economic interest in establishing borrower creditworthiness or a **fair appraisal value of the property** in the loan origination process.

---

[3] www.cohenmilstein.com/media/pnc/4/media.704.pdf

80. The Securities Plaintiff lawsuit further states that mortgage loans were not appraised by a qualified independent appraiser, or in compliance with the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standard Board of the Appraisal Foundation.

81. Specifically the Securities Plaintiffs claimed that COUNTRYWIDE largely disregarded appraisal standards and bought loans without regard to the riskiness of the loan because the values of the underlying mortgage properties were materially inflated in the loan underwriting process.

82. In yet another complaint[4] insurer AMBAC claimed that BEAR STEARNS leveraged its reputation and dominance in mortgage finance to entice companies such as AMBAC to insure loans plagued by rampant fraud ... BEAR STEARNS promised that its mortgage loans originated through proper means and didn't result from fraud, misrepresentation or gross negligence. Yet ... AMBAC discovered widespread breaches of representations in almost 80 percent of the documents supporting 695 defaulted loans it studied.[5]

83. The *AMBAC* suit contains the same allegations of material misstatements and omissions and they disregarded appraisal standards leading to the values of the underlying mortgage properties were materially inflated in the loan underwriting process.

84. Most shocking are these revelations from the *AMBAC* suit: "Moreover, according to Mark Zachary, a former Regional Vice President of COUNTRYWIDE Mortgage Ventures, LLC, COUNTRYWIDE blatantly ignored its underwriting policies and procedures. Mr. Zachary stated that there was a problem with appraisals performed on homes being purchased with COUNTRYWIDE loans. According to Mr. Zachary, **the appraiser was being strongly encouraged to inflate appraisal values** by as much as 6% to allow the homeowner to "roll up"

[4] *AMBAC Assurance Corp., v. EMCMortgage Corp.*, No. 08-cv-9464 (S.D.N.Y.)

[5] Larry Neumeister, NY Lawsuit: BEAR STEARNS Built A 'House of Cards,' *Associated Press*, November 6, 2008.

all closing costs. According to Mr. Zachary, this inflated value put the buyer "upside down" on the home immediately after purchasing it, *i.e.*, the borrower owed more than the home's worth. According to Mr. Zachary, COUNTRYWIDE performed an audit in January 2007 into these matters which corroborates his story.

85. AMBAC stated that Appraisals for properties that COUNTRYWIDE originated were not obtained from independent appraisers because the **appraisal amounts had to conform to pre-determined levels**, or the appraiser's association or employment with COUNTRYWIDE might be at risk...... Combined with the implied or express pressures placed on appraisers to appraise to the desired value, there was enormous upward pressure on appraisal values, distorting loan loan-tovalue ratios and making the mortgage loans in the pool much riskier than suggested by the Offering Documents. This was particularly true in 2006 and 2007 when real estate values in many of the areas where the mortgage pools were located had stopped increasing at the rapid pace of 2004 to 2005.

86. On September 30, 2008, MBIA Insurance Corp. filed a complaint against COUNTRYWIDE in New York state court[6] based on investigations that revealed missing and defective documents and defective inaccurate and inflated appraisals.

87. The *MBIA* suit claimed: MBIA was able to obtain approximately 19,000 loan files for the Certificates it insured as a result of its contractual agreements with COUNTRYWIDE. After reviewing the portfolios and re-underwriting each loan provided by COUNTRYWIDE, MBIA discovered that there was "an extraordinarily high incidence of material deviations from the underwriting guidelines COUNTRYWIDE represented it would follow." *Id.* at ¶78. MBIA discovered that many of the **loan applications "lack[ed] key documentation**... include[d] an **invalid or incomplete appraisal**; .......... or CLTV, fail[ed] to meet stated COUNTRYWIDE guidelines (without any permissible exception)." *Id.* at ¶79. Significantly, "MBIA's re-underwriting review . . . revealed that almost 90% of defaulted or delinquent loans in the COUNTRYWIDE Securitizations show material discrepancies."

[6] *MBIA Insurance Corp. v. COUNTRYWIDE, et al.*, No. 08/602825 (N.Y. Sup. Ct.)

88. ***Misstated and Omitted Information***: As explained above, the appraisals of the properties underlying the mortgage loans were inaccurate and inflated. Furthermore, stated sales price of properties underlying the mortgage loans did not accurately reflect the true value of the properties. These inflated appraisals and misleading sales price figures were used to form the LTV ratios listed in the Prospectus Supplements. Incorporating an inflated appraisal into the LTV ratio calculation will result in a lower LTV ratio for a given loan. For instance, as described above, if a borrower seeks to borrow $90,000 to purchase a house worth $100,000, the LTV ratio is $90,000/$100,000 or 90%. If, however, the appraised value of the house is artificially increased to $120,000, the LTV ratio drops to just 75% ($90,000/$120,000). Due to the inflated appraisals, the LTV ratios listed in the Prospectus Supplements were artificially low..

89. In addition, it was asserted that the servicers did not investigate or resolve consumers' disputes in a timely manner as required of the Servicer nor did it inform defaulted borrowers of impending debt collections. The FTC Complaint described that, "in recent years, during the explosive growth of the mortgage industry, [EMC] acquired and securitized loans at a rapid pace, paying inadequate attention to the integrity of consumers' loan information and to sound servicing practices." According to the FTC Complaint, in servicing loans, EMC neglected to obtain timely and accurate information on consumers' loans, made inaccurate claims to consumers and engaged in unlawful collection and servicing practices.

90. In yet another lawsuit, UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF NEW YORK PENSION TRUST FUND FOR OPERATING ENGINEERS, against STRUCTURED ASSET MORTGAGE INVESTMENTS II INC., BEAR STEARNS ALT-A TRUST 2006-7, and numerous other trusts,[7] the investors claimed that the appraisals obtained by COUNTRYWIDE underwriters were not independent or accurate. "For example, since at least 2005, loan officers from all of COUNTRYWIDE's origination divisions were permitted to (i) hire appraisers of their own choosing, (ii) discard appraisals that did not support loan transactions, and (iii) substitute more favorable appraisals by replacement appraisers when

---

[7] www.doj.state.or.us/public_records/pdf/final_operative_ac.pdf

necessary to obtain a more favorable LTV ratio so as to qualify the loan for approval. COUNTRYWIDE loan officers were allowed to lobby appraisers to assign particular values to a property in order to support the closing of a loan."

91. " Further, according to allegations made by Capitol West Appraisals LLC ("Capitol West") a real estate appraisal company cited in the Securities Complaint, 'COUNTRYWIDE engaged in a pattern and practice of pressuring real estate appraisers to artificially increase appraisal values for properties underlying mortgages COUNTRYWIDE originated and/or underwrote. Capitol West stated that COUNTRYWIDE loan officers sought to pressure Capitol West to increase appraisal values for three separate loan transactions. When Capitol West refused to vary the appraisal values from what it independently determined was appropriate, COUNTRYWIDE retaliated..."

92. "According to Capitol West's allegations in the Securities Complaint, 'COUNTRYWIDE maintained a database titled the 'Field Review List' containing the names of appraisers whose reports COUNTRYWIDE would not accept unless the mortgage broker also submitted a report from a second appraiser. Capitol West was placed on the Field Review List after refusing to buckle under pressure to inflate real estate values. The practical effect of being placed on the Field Review List was to be blacklisted as no mortgage broker would hire an appraiser appearing on the Field Review List to appraise real estate for which COUNTRYWIDE would be the lender because neither the broker nor the borrower would pay to have two appraisals done. Instead, the broker would simply retain another appraiser who was not on the Field Review List."

93. The Securities Complaint further sets forth Capitol West's descriptions of the additional steps COUNTRYWIDE took to enforce its blacklisting of appraisers that refused to artificially inflate their appraisals.

94. Another lawsuit [8] filed by Mark Zachary, a former Regional Vice President COUNTRYWIDE KB Home Loans, Inc. ("CWKB"), alleged that CWKB, a 50-50 joint venture

[8] *Zachary v. COUNTRYWIDE Fin. Corp.*, No. 4:08-cv-00214

between COUNTRYWIDE and KB Home Loans ("KB Home"), stated that there was a problem with appraisals performed on homes being purchased with COUNTRYWIDE loans. According to Zachary, the appraiser was being strongly encouraged to inflate appraisal values by as much as 6% to allow the homeowner to "roll up" all closing costs. According to Zachary, this inflated value put the buyer "upside down" on the home immediately after purchasing it, *i.e.*, the borrower owed more than the home's worth. Thus, the borrower was more susceptible to default. According to Zachary, COUNTRYWIDE performed an audit into these matters in January 2007, which corroborates his story.

95. A civil complaint[9], *Zaldana* further details COUNTRYWIDE's failure to follow standard appraisal practices. The Zaldana Complaint described a process whereby KB Home paid COUNTRYWIDE to make loans with subsidized initial payments to KB borrowers, thereby allowing KB to prop up the ostensible sales prices of KB homes and sell to buyers who would not otherwise be able to afford or qualify for the monthly mortgage payments. In turn, COUNTRYWIDE would have its appraisers ignore the subsidies in order to appraise the home at the full stated sales price, thereby inflating the actual value of the home (*i.e.*, the price that a buyer was truly willing to pay for it).

96. Perhaps the most important of all the lawsuits is the Federal Housing Finance Agency ("FHFA") lawsuit,[10] which claims "….inaccuracies with respect to reported LTV ratios also indicate that the representations in the Registration Statements relating to appraisal practices were false, and that the appraisers themselves, in many instances, furnished appraisals that they understood were inaccurate and that they knew bore no reasonable relationship to the actual value of the underlying properties. Indeed, independent appraisers following proper practices and, providing genuine estimates as to valuation, would not systematically generate appraisals that deviate so significantly (and so consistently upward) from the true values of the appraised properties. This conclusion is further confirmed by the findings of the Financial Crisis Inquiry Commission (the "FCIC"), which identified "inflated appraisals" as a pervasive problem during

---

[99] *Zaldana v. KB Home*, No. CV 08-3399 (EDL),

[10] http://www.fhfa.gov/webfiles/22597/FHFA%20v%20JP%20Morgan.pdf

the period of the Securitizations, and determined through its investigation that appraisers were often pressured by mortgage originators, among others, to produce inflated results. *See* FCIC, Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States (January 2011)."

97. "The originators of the mortgage loans underlying the Securitizations went beyond the systematic disregard of their own underwriting guidelines. Indeed, as the FCIC has confirmed, mortgage loan originators throughout the industry pressured appraisers, during the period of the Securitizations, to issue inflated appraisals that met or exceeded the amount needed for the subject loans to be approved, regardless of the accuracy of such appraisals, and especially when the originators aimed at putting the mortgages into a package of mortgages that would be sold for securitization. This resulted in lower LTV ratios, discussed above, which in turn made the loans appear to the investors less risky than they were."

98. " As described by Patricia Lindsay, a former wholesale lender who testified before the FCIC in April 2010, appraisers "fear[ed]" for their "livelihoods," and therefore cherry-picked data "that would help support the needed value rather than finding the best comparables to come up with the most accurate value." *See* Written Testimony of Patricia Lindsay to the FCIC, April 7, 2010, at 5. Likewise, Jim Amorin, President of the Appraisal Institute, confirmed in his testimony that "[i]n many cases, appraisers are ordered or severely pressured to doctor their reports and to convey a particular, higher value for a property, or else never see work from those parties again … [T]oo often state licensed and certified appraisers are forced into making a 'Hobson's Choice.'" *See* Testimony of Jim Amorin to the FCIC, available at www.appraisalinstitute.org/newsadvocacy/downloads/ltrs_tstmny/2009/AI-ASA-ASFMRANAIFATestimonyonMortgageReform042309final.pdf. Faced with this choice, appraisers systematically abandoned applicable guidelines and over-valued properties in order to facilitate the issuance of mortgages that could then be collateralized into mortgage-backed securitizations."

99. In this case, Plaintiff alleges that a joint venture existed between MARTEL LOFTSLLC, Omri Meron or an affiliated company. [11] It is well published that during the real estate boom COUNTRYWIDE actively sought out joint ventures with builders, which turned the builder's client into captive borrowers and conferred benefits on the builders. This joint venture was not revealed to the Staggs. This collusion led to a sales contract that would had never been consummated had the contract been processed by and independent- unaffiliated lender and arm's length appraisal occurred.

**INFLATED APPRAISAL**

100. The idea of a bank intentionally inflating an appraisal is not a new one. The question has been answered in revelations in several lawsuits. [12] One such lawsuit against the participants in this securitization trust, BEAR STEARNS and COUNTRYWIDE, sums up what was actually happening inside these companies. Clearly the purpose is for creating a piece of paper that looks good- not that is good, to sell on the secondary market for profit.

101. The paradigm is simple: COUNTRYWIDE HOME LOANS obtains appraisals from independent appraisers or appraisal services for properties that are to secure mortgage loans. ***The appraisers inspect and appraise the proposed mortgaged property and verify that the property is in acceptable condition.*** Following each appraisal, the appraiser prepares a report which includes a market data analysis based on recent sales of comparable properties in the area and, when deemed appropriate, a replacement cost analysis based on the current cost of constructing a similar property. ***All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect.***

102. According to Mark Zachary, a former Regional Vice President of COUNTRYWIDE Mortgage Ventures, LLC, COUNTRYWIDE blatantly ignored its

---

[11] http://www.scribd.com/doc/22629919/1-2-3-4-5-6-7-8-9 - 199k

[12] http://www.blbglaw.com/cases/00153_data/2010-2-19-Bear_Stearns_Consolidted_Class_Action_Complaint.PDF

underwriting policies and procedures. Mr. Zachary stated that there was a problem with appraisals performed on property being purchased with COUNTRYWIDE loans. According to Mr. Zachary, the appraiser was being strongly encouraged to inflate appraisal values by as much as 6% to allow the property-owner to "roll up" all closing costs. According to Mr. Zachary, this inflated value put the buyer "upside down" on the property immediately after purchasing it, *i.e.*, the borrower owed more than the property's worth. Thus, the borrower was more susceptible to default. It also put the lender and secondary market investor at risk because they were unaware of the true value of their asset. According to Mr. Zachary, COUNTRYWIDE performed an audit in January 2007 into these matters, which corroborates his story.

103. Appraisals for properties that COUNTRYWIDE originated were not obtained from independent appraisers because the appraisal amounts had to conform to pre-determined levels, or the appraiser's association or employment with COUNTRYWIDE might be at risk. COUNTRYWIDE failed to confirm that appraisers were following the guidelines described by Fannie Mae and Freddie Mac. Combined with the implied or express pressures placed on appraisers to appraise to the desired value, there was enormous upward pressure on appraisal values, distorting loan-to value ratios and making the mortgage loans in the pool much riskier than suggested by the Offering Documents. This was particularly true in 2006 and 2007 when real estate values in many of the areas where the mortgage pools were located had stopped increasing at the rapid pace of 2004 to 2005.

104. The Staggs asked for the appraisal before closing, after closing, and most recently via a RESPA qualified written request. The only appraisal provided by BAC after the Staggs asked repeatedly was *just obtained* and is not an appraisal, but a *review* of another appraisal which contradicts itself, is incomplete and suspect as a cut and paste fabrication. This appraisal was done by Mark Hearn of HEARN QUALITY ASSURANCE and is signed on August 1, 2006 just one day before closing. It is possible that an insurer, underwriter, or warehouse purchaser questioned the value and, thus, the review appraisal was produced. The appraisal fee if $460 on the Application Fee Disclosure and Good Faith Estimate required in California and under Federal law, and $1147 on final HUD -1. The fee is said to be paid to LANDSAFE.

105. The review appraisal conducted by Mark Hearn of HEARN QUALITY ASSURANCE as agent of LANDSAFE Appraisal Services under a contractual agreement states that: (1) The adjusted range is 22% and is considered substantially *undermining the credibility* of the final appraised value; (2) Income and cost approach was not developed even though it is a live/work loft; (3) only 3 comps were near the subject area; (4) *no comps* are shown on this report; (5) the zip code appears to have been wrong on the initial appraisal; (6) actual time on the market for this property was not disclosed; (7) the client is *Washington Mutual* (addendum).

106. After receiving the review appraisal by Blank Rome, the Staggs called Hearn's office and asked if they had the original appraisal. On January 29, 2012 Hearn's staff sent the Staggs the original appraisal done by C. Bill Lee of TC APPRAISAL another agent of LANDSAFE Appraisal Services. Upon inspection the appraisal shows the inappropriate comparables used. This appraisal failed to even use the correct zip code – 90036 instead of 90038.

107. Had the Staggs seen this appraisal they would have immediately been alerted to the collusion fraud and inappropriate comps used including property in West Hollywood, Hollywood Hills and Venice Beach. The Staggs relied on the representations by COUNTRYWIDE BANK and COUNTRYWIDE HOME LOANS, LANDSAFE APPRAISALS, and Omri Meron-MARTEL LOFTS LLC and AMI REAL ESTATE, INC. that the value of $1,450,000 was legitimate for the property. This in fact was false and misleading and has damaged the Staggs with a loss of over $700,000. In fact, COUNTRYWIDE BANK NA as funder handed over this ill gotten gain to Omri Meron -MARTEL LOFTS LLC as the cash received by the seller at closing was $780,000. If the investors have any recourse for these funds it is against COUNTRYWIDE N.A. FKA BANK OF AMERICAN.A., and BEAR STEARNS. In fact, they are seeking just that by virtue of the numerous lawsuits asserted and pending.

108. None of the properties used were work/live lofts or lofts at all, but instead were residences with substantial upgrades in better neighborhoods. This loft was a shell with concrete walls that required over $100,000 in improvement to finish. The Staggs have been damaged by this amount in addition to the down payment and payments made. In short, the appraisals used

inappropriate comparables, were collusive and worthless. **SEE** EXHIBITS 6A, 6B, 6C – Appraisals.

109. A cursory review of the relevant facts and demographic economics reveals the following:

**<u>Comp #1</u>**

9024 Cynthia Street West Hollywood, CA 90069

Located 3.6 miles away and actually located in West Hollywood (zip code 90069), which is regarded as a superior neighborhood, just adjacent to Beverly Hills. Over $147K less than subject and $100K in additional upgrades not in subject property.

**<u>Comp #2</u>**

850 North Croft Avenue West Hollywood, CA 90069

Located 2.2 miles away and actually located in West Hollywood (zip code 90069), which is regarded as a superior neighborhood, just adjacent to Beverly Hills. Valued $232K less.

**<u>Comp #3</u>**

837 Huntley Drive West Hollywood, CA 90069

Located 2.7 miles away and actually located in West Hollywood (zip code 90069), which is regarded as a superior neighborhood, just adjacent to Beverly Hills. This property had superior interior upgrades such as custom tile and a gourmet kitchen.

**<u>Comp #4</u>**

2278 North Helios St. LA, CA 90068

Located 2.9 miles away in the Hollywood Hills, which is a big departure from the lowlands of Highland Ave and Melrose and is considered a superior neighborhood. Valued $163K less.

**<u>Comp #5</u>**

308 North Sycamore LA, CA 90036

Located only .7 miles away and actually located in the same neighborhood, except that this is one of the most exclusive condo addresses in Hollywood. This property is not found on the MLS and therefore this can't be used as a comp.

**<u>Comp #6</u>**

6615 Melrose, Unit #1

Other units in the same complex were used but had not even closed and due to the fact that ALL buyers were subject to the same captive lending contract with COUNTRYWIDE and appraisal with LANDSAFE, none would be appropriate comparables. Affirmative attestations in securitization documents by COUNTRYWIDE state this can't be done.

**Comp #7**

6615 Melrose, Unit #4

Other units in the same complex were used but had not even closed and due to the fact that ALL buyers were subject to the same captive lending contract with COUNTRYWIDE and appraisal with LANDSAFE, none would be appropriate comparables. Affirmative attestations in securitization documents by COUNTRYWIDE state this can't be done.

**Comp #8**

1130 South Flower Street LA, CA 90015

Located 7 miles away in downtown LA, located one block away from the STAPLES CENTER. Superior upgrades and a downtown location with views.

**Comp #9**

206 South Venice Blvd. Venice, CA

Located 11 miles away and 700 feet from the ocean, located on the Venice canals. A property with close proximity to the water is not an appropriate comparison.

110. In one of the documents COUNTRYWIDE produced in response to the RESPA QWR, it reveals that COUNTRYWIDE required the appraisal to be performed by an appraiser of *their* choice from a list of approved appraisers.

111. COUNTRYWIDE states that a *controlled* business arrangement between COUNTRYWIDE and LANDSAFE Appraisal Services Inc. was provided to the Staggs, but this is a false statement and COUNTRYWIDE has never produced such a disclosure. The document stating this is not signed by the Staggs.

112. An appraisal ordered by Staggs on January 24, 2012 states a current market value of $700,000. (**SEE** EXHIBIT 6C). Plaintiff intends to call forth an expert witness regarding the appraisal issues presented.

113. COUNTRYWIDE had an undisclosed affiliated business arrangement with the builder. The builder could not justify the values without a collusive lender. To ensure that the borrower could not go elsewhere, the builder wrote into his contract that the buyer must use COUNTRYWIDE. In exchange for the arrangement, the builder received kickbacks from COUNTRYWIDE and COUNTRYWIDE financed all of the lofts sold. Whether the agreement was in writing or not, the clear intent is in the Joint Purchase and Escrow Agreement. (SEE EXHIBIT 1-Page 3-4)

114. Another level of misrepresentation due to the collusion is in the terms of the COUNTRYWIDE HOME LOANS INC and COUNTRYWIDE BANK loan contract that was forced on the Staggs. After no disclosures of interest rate, terms, prepayment penalty or affiliated business arrangements, the terms offered had nothing to do with the credit profile, loan to value, and other important factors. The terms had more to do with the types of loans BEAR STEARNS needed for the securitization machine to work.

115. By way of edification, fixed rate loans create normal securitization with essentially all of the interest passed through to investors. Subprime adjustable rate loans create excess margins and huge spreads which allow the securitizer to hold and benefit from residual or excess interest classes. For this reason, borrowers are told this is the best and only loan they qualify for, which is a false statement of material fact. The same is true for the addition of a prepayment penalty. BEAR STEARNS created an investment tranche to sell or hold for their own benefit as a bonus to them.

116. The sham originator model is just a trick, as the loans are funded on the BEAR STEARNS warehouse line of credit offered to COUNTRYWIDE and this fact would be revealed in the MERS milestone reports which track the loan from warehouse through securitization.

117. This sham is simply an attempt to create an arm's length transaction, and avoid liability to property owners, investors, and insurers, while all the time, the securitizer BEAR STEARNS is ordering and directing the fraud.

118. This transaction was rife with collusion and a corruption of the independence of the parties involved in a real estate purchase transaction, appraisal, loan processing and mortgage contract. The Staggs have been harmed by the actions of the parties named herein.

119. Plaintiffs ask this Court to enter a Declaratory Judgment rendering the underlying mortgage loan contract as void *ab initio,* or in the alternative, as voidable, at the election of the Plaintiffs.

120. The contract for purchase was coercive and illegally obtained as the contract contained an affiliated business arrangement which led to the Staggs being steered to a specific lender and loan officer and demanded that they accept any terms offered even if an adjustable rate loan vs. a fixed rate loan was offered, a sales contract that penalized them if they even attempted to use another lender (**SEE** EXHIBIT 1), and the icing on the cake, a collusive inflated appraisal to justify the purchase price (**SEE** EXHIBIT 6A & 6B).

121. The transactions included concealment of all material loan terms including:

a) All required California disclosures for sale and purchase of real estate;

b) Under RESPA 3-day rule all federal disclosures of interest rate, fees, prepayment penalty, affiliated business arrangements, must be given within three (3) days of making loan application. In this case COUNTRYWIDE- LANDSAFE ran the Staggs credit on 6/19/2006 (SEE EXHIBIT 5), TC APPRAISAL signed the report on 7/21/2006 (SEE EXHIBIT 6A), and on 6/22/2006 COUNTRYWIDE HOME LOANS Eddie Avakian claims to have had a telephone interview for loan application. (SEE EXHIBIT 31) The disclosures, which are not dated by the Staggs, are dated 6/26/2006. An additional set of good faith estimates are dated 7/17/2006, but also not signed by the Staggs. Even if the Staggs would have received the loan terms estimates, they were not correct (SEE EXHIBITS 7, 8, 9, 10, 14, and 19).

122. The Staggs transaction:

a) Never received a complete signed set of documents at closing;

b) Never received the final HUD -1, only an incorrect buyers /borrower statement (SEE EXHIBIT 32);

c) The processing fee on the HUD-1 for $390 has no party who received the fee and may have gone to Omri Meron – Martel Lofts LLC (SEE EXHIBIT 31);

d) The Appraisal was concealed from the Staggs though they asked for it before closing (SEE EXHIBIT 28), and in subsequent letters (SEE EXHIBITs 35,37,40) The Staggs ultimately were sent a review of the original appraisal in January 2012, and the Staggs contacted that appraiser who provided the original he reviewed. SEE EXHIBITS 6A & 6B

123. <u>The transaction is *Void Ab Initio* as Against Public Policy:</u> All parties claiming rights to enforce, ownership rights, or some right stemming from cash flow of the securities, knew the truth about the loan document deficiencies by virtue of a document exception report required to be performed by the Trustee CITIBANK within 90 days of the closing of the trust (10/31/2006). This report was shared with COUNTRYWIDE BANK, BEAR STEARNS, WELLS FARGO and all other parties in interest, who may have already made claims related to that report.

124. The predatory nature of the loan is clear on the loan tape audit (**<u>SEE</u>** EXHIBIT 46 – Forensic Audit Report) which clearly shows that some borrowers with credit profiles that were worse or no better than the Staggs received better loan terms. Some borrowers did not have prepayment penalties, some received fixed rate loans, and some received lower interest rates.

125. The COUNTRYWIDE concealment of true and complete terms of the loan which is clear in the Staggs loan file shows lack of disclosures, and an intentional interference with the loan officer/broker-borrower relationship, the right of the borrower to choose lender and settlement providers.

126. The right to shop for a lender was taken away due to the onerous terms of the purchase agreement and collusion between COUNTRYWIDE and MARTEL LOFTS LLC. The Staggs believe that this arrangement conferred benefits upon the seller, MARTEL LOFTS LLC in assuring an inflated appraisal, and a locked in loan no matter how detrimental the loan terms. COUNTRYWIDE (now Bank of America) does not possess any documents that show that the Staggs applied for a loan with COUNTRYWIDE HOME LOANS Inc. in connection with the purchase of this property. As shown in the loan file produced in response to the RESPA qualified written request, loan application, disclosures, preliminary truth in lending and good faith estimates, and affiliated business arrangements, are all unsigned.

127. Bad Faith is evident in the lack of signed documents, combined with the concealment of the appraisal and collusion between MARTEL LOFTS LLC – Omri Meron, COUNTRYWIDE HOME LOANS – Eddie Avakian, and COUNTRYWIDE BANK and LANDSAFE Appraisals, which was to the detriment of the Staggs.

128. The collusion and concealment caused the Staggs to be steered to a bad loan with COUNTRYWIDE without the mandatory disclosures, and financial hardship due to the concealed inflated value that COUNTRYWIDE procured using its captive subsidiary LANDSAFE for the appraisal.

## COUNT TWO

## UNJUST ENRICHMENT

## AS AGAINST COUNTRYWIDE FINANCIAL CORPORATION ("CFC"), COUNTRYWIDE HOME LOANS, INC. ("CHL"), AND COUNTRYWIDE HOME LOANS SERVICING, L.P. FKA BAC HOME LOANS SERVICING L.P. FKA BANK OF AMERICA, N.A. ("BOA"), LANDSAFE APPRAISAL SERVICES INC., EDDIE AVAKIAN, C. BILL LEE- TC APPRAISALS, MARK HEARN, HEARN QUALITY ASSURANCE INC., OMRI MERON- MARTEL LOFTSLLC - OMRI MERON, AMI REAL ESTATE, INC., STRUCTURED ASSET MORTGAGE INVESTMENTS II INC. ("SAMI"), BEAR STEARNS ALT-A TRUST 2006-7 ("BSALT 2006-7"), CERTIFICATE HOLDER OF BSALT 2006-7, DOES 1-10

129. Plaintiffs hereby incorporate by reference each and every one of the preceding paragraphs as if the same were fully set forth herein.

130. As this was a purchase and the Staggs were investing over $311,000 in down payment funds and signing for an additional 1,160,000 mortgage, it was crucial to their decision making that the property had the appraised value presented. Total invested at this point is $759,649.49 and the property value is $700,000 according to an appraisal procured by the Staggs on January 24, 2012. **SEE** EXHIBIT 6E. This has damaged the Staggs by $759,649.49 plus improvements to the property of $75,000.

131. Due to the collusion between Omri Meron -MARTEL LOFTS and AMI REAL ESTATE, INC., COUNTRYWIDE HOME LOANS, COUNTRYWIDE BANK, LANDSAFE APPRAISALS, C. Bill Lee -TC Appraisals, Mark Hearn – HEARN QUALITY ASSURANCE, and BEAR STEARNS, this value was not true and the Staggs have suffered financial harm investing a total of payments of $373,576.91 + down payment of $311, 072.58 + finish improvements of $75,000, for a grand total invested of $759,649.49. The Staggs made 54 payments from September 2006 to January 2011 as follows:

1. (April, 10 to Feb 11) 14 Payments x $7,2002.80 = $100,839.20
2. (June, 08 to Nov 09) 19 Payments x $6,859.82 = $123,476.76
3. (March 08 to May 08) 2 Reg. plus misc. payments = $18,398.45
4. (Sept, 06 to Feb 08) 19 Payments x $6,887.50 = $130,862.50

132. The entire amount charged as fees, and received as profits by Omri Meron - MARTEL LOFTS -$780,000, COUNTRYWIDE HOME LOANS –unknown amount, COUNTRYWIDE BANK-unknown amount, LANDSAFE APPRAISALS - $1147, C. Bill Lee - TC APPRAISALS –unknown amount, Mark Hearn – HEARN QUALITY ASSURANCE –

unknown amount, and BEAR STEARNS-unknown amount, should be disgorged as to ALL Defendants. **SEE** EXHIBIT 31- HUD 1

133. The gain for MARTEL LOFTS of over $780,209 was unjust enrichment due to an affiliated business arrangement with COUNTRYWIDE, improper steering that lender, and a conspiracy to inflate the appraisals.

**COUNT THREE**

**WRONGFUL FORECLOSURE**

**AS AGAINST BANK OF AMERICA, N.A. ("BOA"), BAC HOME LOANS SERVICING L.P., LANDSAFE TITLE INC., STRUCTURED ASSET MORTGAGE INVESTMENTS II INC. ("SAMI"), RECONTRUST, CITIBANK N.A., BEAR STEARNS ALT-A TRUST 2006-7 ("BSALT 2006-7"), CERTIFICATE HOLDERS OF BSALT 2006-7, MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., DOES 1-10**

134. Plaintiffs hereby incorporate by reference each and every one of the preceding paragraphs as if the same were fully set forth herein.

135. California forbids the recording of false or fraudulent documents pursuant to California *Penal Code* §523(f)(a). RECONTRUST recorded a false document – CORPORATE ASSIGNMENT OF DEED OF TRUST, in collusion with BANK OF AMERICA, MERS signer T. Sevillano, and CITIBANK as Trustee for BSALT 2006-7. **SEE** EXHIBIT 20.

136. Defendants RECONTRUST, CITIBANK, COUNTRYWIDE BANK, and MERS, acting as agents on behalf of the Certificate Holders of BSALT 2006-7, violated this law on two documents that they recorded in Los Angeles County related to the Staggs property, as follows:

a) The Note and Deed of Trust were NOT assigned or transferred respectively to the Trust by the cut-off date (since by August 18, 2011, the Trust was long closed) and the Trust was thus unfunded by this particular loan and the security no longer "mortgage-backed,"

b) The assignment contains false statements as it purports to assign the Deed of Trust and beneficial interest therein into a closed REMIC trust, and/or that no such assignment actually took place and was merely fabricated to create the gloss of compliance with the PSA, New York trust law, and IRS REMIC code.

c) The assignment was executed based on a false document created with photo-shopped endorsement stamps.

137. Finally, this *Interest First Only Note* document (the assignment) contains a material misstatement of fact or a false claim, because the endorsement stamp was photo-shopped in.

138. The subsequent document is defective in that it was in reliance on the COUNTRYWIDE endorsed *Interest First Only Note* in blank. This led to an assignment from MERS to BSALT 2006-7 trustee CITIBANK executed by robo-signer "T. Sevilliano," who is not an Assistant Secretary (or any officer or employee) of MERS, nor was she authorized to sign assignments on behalf of MERS, nor was she authorized to do business in the State of California on behalf of a corporation that is not registered to do business in the State of California.

139. "T. Sevilliano" does not indicate he or she is signing as an officer or authorized representative of either MERS or CITIBANK as her principal. She signs as an Assistant Secretary. Therefore, it is vague and ambiguous as to what the notary is actually acknowledging and on whose behalf the signer is signing, rendering the notarial acknowledgment meaningless.

140. The Staggs are informed that "T. Sevilliano" is not now, and has never been an employee of MERS and is, in fact, an employee of RECONTRUST.

141. The Staggs are informed that "T. Sevilliano" is not an Officer of, or even employed by, MERS or CITIBANK and has not been legally appointed as a certifying officer/agent of MERS or CITIBANK.

142. T. Sevillano, an employee of RECONTRUST, has no personal knowledge of the chain of assignments and ownership, COUNTRYWIDE endorsements, or the records maintained on the MERS system. RECONTRUST and LANDSAFE TITLE are not listed as active members of MERS.[13] CITIBANK as Trustee is listed, but the party with access to the system is Joseph P. Nestor –member ORG ID 1004210, not the person making the assignment for CITIBANK as representative of MERS, T. Sevillano. How can someone who is not a registered member of MERS, RECONTRUST and agent T. Sevillano purport to execute assignment for MERS with no access to the MERS system to review the history?

**Notice of Trustee's Sale**

143. On November 23, 2011, the Defendants RECONTRUST and LANDSAFE Title pursuant to the order of CITIBANK, BANK OF AMERICA, or some other unknown entity, caused to be recorded in the public records of Los Angeles County a Notice of Trustee's Sale, Record No. 20111593263. **SEE** EXHIBIT 24

144. The Substitution of Trustee recorded with the County Recorder was not executed by anyone. **SEE** EXHIBIT 26.

145. The Corporate Assignment of Deed from MERS to CITIBANK as Trustee for the Certificate Holders of BSALT 2006-7 was signed by T. Sevillano, a party with no actual knowledge of the underlying documents or transactions. **SEE** EXHIBIT 21

146. The underlying document *Interest Only Adjustable Rate Note,* has a photo-shopped endorsement used for the intent to mislead the Staggs, the investors, and the Court into believing that a securitization trust known as BSALT 2006-7 and Trustee Citibank can enforce the note.

---

[13] http://www.mersinc.org/

147. Each of the Defendants who recorded or caused to be recorded the above-described documents knew or had reason to know, at the time these documents were recorded, that each said document was fraudulent, contained a material misstatement and false claim, is not authorized by statute, judgment or other specific legal authority and was therefore groundless and invalid.

148. Defendants CITIBANK, BANK OF AMERICA, BSALT 2006-7 and MERS know the actual chain of ownership is defective and can't be repaired. These parties further have acted with actual knowledge of this fact.

149. Defendants CITIBANK, BANK OF AMERICA, BSALT 2006-7 and MERS know the actual Note was converted to an e-note, or electronic copy and that the original was destroyed. Therefore they can't produce the original document for inspection. Plaintiffs therefore allege that the chain of ownership is defective and can't be repaired and the Defendants named herein can't establish ownership through possession of the original note. These parties further have acted with actual knowledge of this fact.

150. The Trustee's Sale of the Property that was noticed on November 23, 2011 by Defendant RECONTRUST and all efforts to take the Staggs' property in foreclosure is improper and invalid based on the following facts and those alleged above.

**The Owner/Holder of the Note Did Not Experience Default**

151. The misrepresentations continue in that the Staggs were not in default at the time of the recording of the Notice of Trustee's Sale because of the prior breaches of the defendants. This is more fully identified in Paragraph 27 and is incorporated herein by reference.

152. The Staggs were not in default at the time of the recording of the Notice of Trustee's Sale, because the loan servicer, BANK OF AMERICA HOME LOAN SERVICING FKA BANK OF AMERICA, was making payments on the Staggs' behalf to the investor and/or Holder of the Staggs Note in conformance with its obligations under the applicable Pooling and

Servicing Agreement or similar contractual arrangement.

153. The Staggs were not in default at the time of recording of the Notice of Trustee Sale because the investors promised the proceeds of interest and principal in this loan assigned to specific tranches (CUSIP) investment classes has received all distributions pursuant to contractual promises found in the PSA of LIBOR plus a small percentage, currently creating a pass through of only .46360%. In fact the Staggs have afforded the trust extra interest to pay for other defaulted borrower, for Bear Stearns to earn excess interest of 317%. Even with a high level of defaults the structure of LIBOR plus a small margin is still producing excess interest. The losses only happen when a loan is liquidated and the true value of the property is revealed and losses realized. **SEE** EXHIBIT 46

154. Further, the Note and Deed of Trust were separated since the inception of this loan. As alleged above, this action constituted a breach of the terms of the Deed of Trust, but it also prevents any of the parties from foreclosing by advertisement and sale, as the holder of the Note is the holder of an unsecured debt and therefore may not avail itself of the non-judicial foreclosure provisions of the Deed of Trust. The attempt at bringing the Deed of Trust and the Note back together was done with misrepresentation and fabrication of documents.

155. Likewise, in this situation, the assignee of the Deed of Trust without assignment of the underlying debt obligation has an unperfected lien and can never experience default and therefore cannot rightfully foreclose on the Staggs' property at all.

156. In the alternative, even if the Defendant CITIBANK were to have taken a legal and valid assignment of the Deed of Trust, it did not do so in its capacity as Trustee of the Trust. Under the terms of the PSA, all beneficial ownership interest in the pool of residential mortgage loans, including the Staggs loan, passed to the investors of the Trust. The investor in this case is not a trust at all, but due to a liquidating trust structure the loan is only pledged to one class (CUSIP I-A-1), which is held by one investor.

157. The Staggs investigation of BSALT 2006-7 revealed it may not even be a legally

formed trust and has no legal formation structure. (SEE EXHIBIT 44) There is no evidence that the Trust ever was funded with (or the Depositor ever took possession, by purchase or transfer or otherwise), the Staggs Note by the closing date of the Trust (October 31, 2006) and no evidence that the Note was properly endorsed to the Trust or its Trustee. In fact, a suspect endorsement has been presented, and a robo-signed assignment from MERS. Neither is valid.

158. Therefore, the Defendant CITIBANK and BSALT 2006-7 cannot be the holder/owner of the Staggs Note entitled to initiate foreclosure of his Deed of Trust and sale of this property.

159. The assignment of a deed of trust, without a legal transfer of the debt, transfers nothing (the Note, and the debt obligation it memorializes, does not "follow" the Deed of Trust). As the Note is now unsecured, its holder may no longer employ non-judicial foreclosure of the property that once secured it as a right or remedy to any event of default on the Note.

160. As the investor/Holder of the Note did not experience default, it (CUSIP I-A-1 holder) had no right to accelerate the Note, invoke the power of sale, initiate or participate in foreclosure or sell the Staggs' Property.

**MERS Knowingly Acted Without Authority and Published and Recorded False Statements**

161. On April 12, 2011, MERS accepted a Consent Cease and Desist Order issued by the United States Department of the Treasury, Comptroller of the Currency, Board of Governors of the Federal Reserve System, Federal Deposit Insurance Corporation, Office of Thrift Supervision, and the Federal Housing Finance Agency. The audit conducted by these regulators found that, with regard to its "foreclosure services" to its members, MERS "failed to exercise appropriate oversight, management supervision and corporate governance, and [has] failed to devote adequate financial, staffing, training, and legal resources to ensure proper administration and delivery" of such services and engaged in other "unsafe and unsound practices." In response to widespread robo-signing of documents affecting rights related to real property, the Consent

Order requires MERS to devise and put in place a method of assuring its "certifying officers" are actually authorized by authentic corporate resolution. Evidence of some of these unsound practices can be seen in the documents MERS created to initiate the foreclosure of the Staggs' property, as more fully set forth herein.

**None of the Named Defendants Was Authorized or Warranted to Foreclose**

162. Neither the Defendant MERS as electronic tracker of the ownership, BANK OF AMERICA, as loan servicer, or CITIBANK as Trustee of BSALT 2006-7, was legally able to invoke the power of sale and authorize anyone to initiate foreclosure under the terms of the Deed of Trust or to authorize the sale of the Staggs' Property unless the investors authorized the foreclosure. It is impossible to assume that this is the case as investors are suing all of these parties for their actions regarding origination, servicing and foreclosure of loans. Further the investors would lose 60-100% upon liquidation of the loan. **SEE** EXHIBIT 47 – Monthly Investor Report.

163. None of the Defendants were the present holder of the Note and Deed of Trust at the time of the notice and sale.

164. Even if the Defendants were acting at the direction of an agent for a party that, in another capacity, coincidentally was the mortgage holder, the notice and conduct of the foreclosure sale in the Defendants' names under the incorrect representation that the Defendants were the mortgage holders and/or had authorization to proceed with the foreclosure sale was improper and renders the sale invalid and void.

165. The Defendants, and each of them, knew that their statements on recorded documents and notices sent to the Staggs were false and invalid, and knew or should have known that their conduct would cause serious harm to the Staggs.

166. All the Defendants have breached their obligations under the mortgage contracts and as set forth in, among other laws, California statutes relating to non-judicial foreclosures and New York Trust law governing the applicable Pooling and Servicing Agreement and/or Trust

Agreement(s) that determined the disposition of the Staggs Note, of which the Staggs is a third-party beneficiary (because without such agreements, such loans would not be readily available to borrowers such as the Plaintiff in 2006).

167. All of the defendants have also breached their obligations to the Staggs by allowing their agents/employees to sign documents without legal authority, thereby initiating a trustee's sale, with the goal of taking Plaintiff's property, and causing that property to be taken from him and sold, without legal basis.

168. The Defendants apparently acted knowingly and willfully for their own financial gain and in complete disregard for the rights and interests of the Staggs and for the law, and in any event failed to act fairly and in good faith in invoking the power of sale under the Staggs' Deed of Trust, initiating foreclosure and selling the Staggs property unlawfully.

169. The Defendants' actions proximately caused damage to the Staggs, including the costs of defending the wrongful foreclosure and to avoid the unwarranted loss of the property. The Staggs have suffered damage to title, damage to credit, damage to reputation and financial loss in trying to protect their Property. The Staggs also face possible deficiency judgment or other unfair tax consequences and the costs of rebutting and defending them as a direct result of Defendants' actions.

170. The Staggs, after diligent inquiry, have not yet discovered and have no present knowledge of who the legal holder of the Note is, who is entitled to payments, and whether the Note still exists. The Staggs are in jeopardy, as the true holder of the Note or other third parties could come forward claiming an unsatisfied interest in the Note, and those parties may be subject to the Staggs various affirmative defenses and counterclaims. The Staggs are entitled to proof of the true holder of the Note to avoid this imminent danger.

**COUNT FOUR**

**TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS**

**AS AGAINST BANK OF AMERICA, N.A. ("BOA"), BAC HOME LOANS SERVICING**

**L.P., RECONTRUST, MERS, CITIBANK, WELLS FARGO and DOES 1-10**

171. Plaintiffs hereby incorporate by reference each and every one of the preceding paragraphs as if the same were fully set forth herein.

172. The Note that the Staggs executed constitutes a contract of which the parties are attempting to enforce between the Staggs and COUNTRYWIDE as lender, later sold to BEAR STEARNS who in turn is purported to have sold it into BSALT 2006-7 trust.

173. The Defendants had knowledge of the contractual relationship, and have interfered with attempts to subvert it with the recording of documents related to that contract asserting an interest in it and the Property securing it, as alleged above and below.

174. The defendants intentionally interfered with that contract and the contractual relationship, inducing or causing a breach of the security instrument as alleged herein above and below. The splitting of the Note and Deed of Trust, the wrongful recording of documents asserting assignments and interest in the Staggs property, the initiation of foreclosure without authority from the true parties in interest and possibly against their best interest and wishes, and all the other wrongful acts described herein operated to disrupt the Staggs contractual relationship with his lender and trustee, and constituted a material breach of several provisions of the Deed of Trust as alleged herein.

175. The actions of the defendants were improper and resulted in damages to the Staggs of all funds invested in the property ($759,649), including but not limited to the costs of litigation to avoid the loss of his property at trustee's sale by virtue of a non-judicial foreclosure process that was conducted without cause, without proper authority or provision of law and in violation of the terms of their contract, and improvements invested.

176. The Staggs have suffered damage to title, damage to credit, damage to reputation and financial loss in trying to protect their Property, and face going forward consequences of a possible deficiency judgment or other unfair tax consequences and the costs of rebutting and

defending them as a direct result of Defendants' actions.

**COUNT FIVE**

**PROMISSORY ESTOPPEL/CONSTRUCTIVE TRUST**

**AS AGAINST BANK OF AMERICA, N.A. ("BOA"), COUNTRYWIDE FINANCIAL CORPORATION ("CFC"), COUNTRYWIDE HOME LOANS, INC. ("CHL"), AND COUNTRYWIDE HOME LOANS SERVICING, L.P. FKA BAC HOME LOANS SERVICING L.P., LANDSAFE TITLE INC., LANDSAFE APPRAISAL SERVICES INC., EDDIE AVAKIAN, C. BILL LEE- TC APPRAISALS, MARK HEARN, HEARN QUALITY ASSURANCE INC., OMRI MERON- MARTEL LOFTSLLC - OMRI MERON, AMI REAL ESTATE, INC., DOES 1-10**

177. Plaintiffs hereby incorporate by reference each and every one of the preceding paragraphs as if the same were fully set forth herein.

178. This case is based on a disputed contract obtained in collusion with substantial misrepresentation, and subsequent disputed ownership of that contract. '

179. COUNTRYWIDE, COUNTRYWIDE HOME LOANS, INC. ("CHL") and agent EDDIE AVAKIAN, COUNTRYWIDE HOME LOANS SERVICING, L.P. FKA BAC HOME LOANS SERVICING L.P. FKA BANK OF AMERICA, LANDSAFE APPRAISAL SERVICES INC., C. BILL LEE- TC APPRAISALS, MARK HEARN, HEARN QUALITY ASSURANCE INC., OMRI MERON- MARTEL LOFTSLLC - OMRI MERON, AMI REAL ESTATE, INC., and DOES 1-10, knew that the Staggs were investing over 311,000 in down payment funds, and would be saddled with a loan for over $1,160,000 million and were acting in detrimental reliance on the appraised value in the transaction.

180. In this case by virtue of the large down-payment, improvements made to the property by the Staggs, payments and fees received by COUNTRYWIDE HOME LOANS SERVICING, COUNTRYWIDE BANK FKA BANK OF AMERICA, and the Certificate holders

of BSALT 2006-7 trust, have already been more than compensated for the *true* value of the property which is only $700,000. See *Dillwyn v Llwellyn (1862) 4 De G.F.& J. 517 C.A.* (a father promised a house to his son who took possession and spent a large sum of money improving the property. The father never actually transferred the house to the son. When his father died, the son claimed to be the equitable owner and the court ordered the testamentary trustees to convey the land to him.) See also *Inwards v Baker [1965] 2 Q.B. 29, C.A.* In *Wilmott v Barber* (1880) 15 Ch D 96, the Court considered that five elements had to be established before proprietary estoppel could operate:

1. the plaintiff must have made a mistake as to his legal rights;
2. the plaintiff must have done some act of reliance;
3. the defendant, the possessor of a legal right, must know of the existence of his own right which is inconsistent with the right claimed by the plaintiff;
4. the defendant must know of the plaintiff's mistaken belief; and
5. the defendant must have encouraged the plaintiff in his act of reliance.

181. In the purchase of this property, the Staggs were led to believe facts that were not true and, in fact, were promised that the value of the building was sound and therefore relied upon it to make an investment. The Staggs were forced by the developer to use his choice of lender, which led to the lender choosing the appraiser. The appraisers LANDSAFE, HEARN and TC APPRAISALS were a false representation of value as fully set forth herein. The Staggs are now in a horrible upside investment and an upside down loan to match.

182. Omri Meron -MARTEL LOFTS LLC and AMI REAL ESTATE, INC., COUNTRYWIDE BANK, and BEAR STEARNS knew that the accuracy of the appraisal was critical to the success of the tender and the legitimacy of the contract as a whole. The Court may apply promissory estoppel and allow the Staggs to pay only what the property is worth. Tender should be the sum of the difference between money already paid or $784,649 and true market value.

183. One contentious point is how to calculate the amount of damages flowing from a promissory estoppel. The language eventually adopted for the Second Restatement reads: "The

remedy granted for breach may be limited as justice requires." — a formula which leaves quantification to the discretion of the court.

**COUNT SIX**

**SLANDER OF TITLE**

**AS AGAINST BANK OF AMERICA, N.A. ("BOA"), COUNTRYWIDE FINANCIAL CORPORATION ("CFC"), COUNTRYWIDE HOME LOANS, INC. ("CHL"), AND COUNTRYWIDE HOME LOANS SERVICING, L.P. FKA BAC HOME LOANS SERVICING L.P., LANDSAFE TITLE INC., STRUCTURED ASSET MORTGAGE INVESTMENTS II INC. ("SAMI"), RECONTRUST, CITIBANK N.A., BEAR STEARNS ALT-A TRUST 2006-7 ("BSALT 2006-7"), CERTIFICATE HOLDERS OF BSALT 2006-7, MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., DOES 1-10**

184. Plaintiffs hereby incorporate by reference each and every one of the preceding paragraphs as if the same were fully set forth herein.

185. The recording of the Notice of Trustee's Sale and attendant facts alleged above regarding the Staggs' property constitutes a false and malicious written and published statement disparaging their title to property that caused harm to the Staggs, and threatens to cause irreparable harm if not reversed or remedied by this Court.

186. As alleged above, the Defendants knew or should have known that the published statements were false, groundless, misleading and disparaging to the Staggs title or they made the statements without any regard for their truthfulness and the harm such action would foreseeably cause to the Staggs.

187. The substantial failure of MERS and members thereof such as COUNTRYWIDE, BANK OF AMERICA, CITIBANK, and other DOE defendants to maintain accurate and sufficient business records on the MERS system has created a cloud on the title which must be fully cleared.

188. The Defendants, RECONTRUST, MERS, BANK OF AMERICA, CITIBANK, and unknown DOE defendants actively participated in fabrication and/or publishing of fraudulent documents which are likely to result in pecuniary harm to the Staggs through the conduct of third persons in respect to his interest in the Property.

189. All of the Defendants have been put on notice of the false statements on the recorded documents via a RESPA letter sent by the Staggs. **SEE** EXHIBIT 38

190. The recorded documents were invalid, as alleged above they were without underlying merit or truth and are therefore presumed by law to be fraudulent and void, and executed by parties with no personal knowledge of the truth.

191. As alleged above, the Defendants acted knowingly, intentionally, in violation of statute, without privilege or justification and thus with malice, express or implied.

192. As a direct and proximate cause of the Defendants' actions, the Staggs title has been slandered and there is a cloud on the Staggs title. They have suffered substantial economic harm including but not limited to the loss of equity in the property, damage to credit, damage to reputation and the expenditure of costs, fees and time in trying to protect their property from unwarranted loss at Trustee's Sale.

193. As the Defendants wrongly benefited at the direct expense of the Staggs, equity and good conscience require restitution and resolution of title.

## COUNT SEVEN

## DECLARATORY RELIEF/QUIET TITLE

## AS AGAINST BANK OF AMERICA, N.A. ("BOA"), COUNTRYWIDE FINANCIAL CORPORATION ("CFC"), COUNTRYWIDE HOME LOANS, INC. ("CHL"), AND COUNTRYWIDE HOME LOANS SERVICING, L.P. FKA BAC HOME LOANS SERVICING L.P., LANDSAFE TITLE INC., STRUCTURED ASSET MORTGAGE INVESTMENTS II INC. ("SAMI"), RECONTRUST, CITIBANK N.A., BEAR STEARNS

**ALT-A TRUST 2006-7 ("BSALT 2006-7"), CERTIFICATE HOLDER FOR BSALT 2006-7, MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., DOES 1-10**

194. Plaintiffs hereby incorporate by reference each and every one of the preceding paragraphs as if fully set forth herein.

195. Pursuant to the Borrower Covenants on p. 4 of the Deed of Trust recorded on August 11, 2006 on the Staggs property known as 6615 Melrose Ave Suite 2, Los Angeles CA 90036, Borrower must defend generally the title to the Property against all claims and demands. The title insurer Stewart Title may be asked to defend the lender title, and this will create a conflict of interest, as the owner's title insurer is also Stewart Title. This must be disclosed at the onset of representation of the parties.

196. The Staggs are now, and at all times herein mentioned was, since August of 2006, the owner, possessor and person entitled to possession of the property located at 6615 Melrose Ave Suite 2, Los Angeles CA 90036.

197. The Staggs are credibly informed and believes that the Defendants, and each of them, claim an interest in the property adverse to the Staggs as evidenced by documents they recorded in the Office of the Los Angeles County Recorder and their actions in reliance of those documents to foreclose upon and take the Staggs property.

198. The Staggs are credibly informed and believe that the evidence shows that the claim of the Defendants is without any merit or right whatsoever, and/or is based on misrepresentations of fact in the original transaction, fraudulent and fabricated endorsement documents and subsequent documents executed in reliance on false documents recorded in Los Angeles County in violation of California law, and that the Defendants have no legal or equitable right, claim, or interest in the Property.

199. The tracking of assignments and ownership never occurred on the MERS system. The note was converted by MERS into an e-note and the original note no longer exists.

200. It is clear from the January investor report and end of year 1099 statements sent to certificate holders showing only one EIN beneficiary tax ID, that only one CUSIP investment tranche is the true party in interest, AKA beneficial interest holder. The investors are suing for breach of contract and rescissions of the contracts therefore the parties have already rejected title to the property.

201. Securitization promises without *actual* securitization PSA requirements followed, create recourse between the parties to the contracts, one against the other, but no claim to a loan that the loan trust never took assignment for or possession of.

202. This cloud on title is compounded by MERS lack of producing internal records concerning initiation of a transfer by transferor, and acceptance by transfer recipient. **SEE** EXHIBIT 50 Page 46-72 -MERS MANUAL

203. The MERS MANUAL further explains on Page 46, that MERS can't transfer beneficial ownership, only track it, and the only way to transfer interest is through an endorsement on the note. The MERS manual states as follows:

Transfer of Beneficial Rights to Member Investors- Overview

Although MERS tracks changes in ownership of the beneficial rights for loans registered on the MERS System, MERS cannot transfer the beneficial rights to the debt. The debt can only be transferred by properly endorsing the promissory note to the transferee.

204. RECONTRUST filed a Corporate Assignment of Deed of Trust purporting to transfer an interest in the Staggs August 2, 2006 Deed of Trust from MERS directly to the trustee of a securitization Trust that closed on October 31, 2006.[14] This is in violation of the controlling document (the Pooling and Servicing Agreement,) New York trust law, and IRS REMIC rules. **SEE** EXHIBIT 20

205. This assignment is signed by known robo-signer T. Sevillano and the Staggs

[14] http://www.sec.gov/Archives/edgar/data/1378876/000106823806001071/bsalta2006-7_424b5.htm

allege this is not her signature thereby making this a fraudulent document filed with the intent to defraud the Staggs. **SEE** EXHIBIT 20 – Example signatures.

206. This assignment is purportedly notarized by Ann G. Montealegre, and, based on information and belief, T. Sevillano did not sign this document in front of Ann G. Montealegre thereby making this a fraudulent document filed with the intent to defraud the Staggs.

207. T. Sevillano as employee of RECONTRUST, not MERS, has no personal knowledge of the entries on the MERS system, how they were entered and by whom.

208. T. Sevillano appears to work for dozens of companies signing in their name. The Staggs allege that T. Sevillano has no authorization to transfer this loan as only the members have the right to enter transfers and the requirement is an initiation of transfer on the MERS system and an acceptance by the transferee. This did not happen. The investors thought the transfer happened at close of the trust.

209. The transfers that legally must take place to comply with New York trust law, the PSA, and to protect the bankruptcy remote status and IRS tax benefits, included:

A) COUNTRYWIDE HOME LOANS Inc. to COUNTRYWIDE BANK, N.A.
B) COUNTRYWIDE BANK N.A. to EMC who purchased the loans for the pool
C) EMC to Structured Asset Mortgage Investments II Inc. as Depositor
D) Structured Asset Mortgage Investments II Inc. to BEAR STEARNS ALT-A 2006-7 as Issuing Entity.

210. The trust documents state: Structured Asset Mortgage Investments II Inc., referred to herein as the Depositor, was formed in the state of Delaware on June 10, 2003, and is a wholly-owned subsidiary of The Bear Stearns Companies Inc. The Depositor was organized for the sole purpose of serving as a private secondary mortgage market conduit. ........ In conjunction with the Sponsor's acquisition of the mortgage loans, the Depositor will execute a mortgage loan purchase agreement through which the loans will be transferred to itself. These loans are

subsequently deposited in a common law or statutory trust, described herein, which will then issue the Certificates.

211. The Defendants have also caused to be recorded in the public records of Los Angeles County, California, a Notice of Trustee's Sale recorded without authority in wrongful reliance upon the fraudulent photo-shopped assignment endorsement that is not present on the file produced in response to the RESPA qualified written request. This endorsement appears to be two stamps, stamped separately, but upon inspection of other case documents it is clear this is a lifted stamp, not an original. The original note has been destroyed therefore making it impossible to inspect and this constitutes destruction of evidence.

212. A trust must have the following essential elements:

- a settlor (the person who creates the trust)
- **the assets to put into the trust**
- a trust deed (the legal document setting up the trust)
- one or more trustees (those in charge of administering the trust)
- beneficiaries

213. CITIBANK as Trustee owes a ***fiduciary*** duty to the beneficiaries, who are the "beneficial" owners of the trust property. The terms of the management of the trust are set forth in the PSA, prospectus, 424b, master loan purchase and sale agreements, servicing agreements, and other documents. The trust is governed by the terms under which it was created. The essential term here is that the loans must be transferred to the trust to preserve its bankruptcy remote status and IRS tax benefits as a REMIC.

214. The trustee is obliged to administer the trust in accordance with both the terms of the trust and the governing law of New York.

215. Once the trust is written and executed (signed), a federal identification number known as the Employer Identification Number (EIN) needs to be assigned to the trust. *Every legal entity needs an EIN, whether or not they have employees.* After diligent search of all EIN

numbers on the end of year 1099 statements WELLS FARGO issues to security holders, the Staggs have no idea who the real party is or if the trust has its own EIN number. **SEE** EXHIBIT 46

216. After a diligent search, the Staggs have no knowledge if the trust is a legal entity, what its legal jurisdiction is, or what type of legal entity it is. **SEE** EXHIBIT 44

217. A recent insurer lawsuit revealed that there must be proof the assignment was made by a party that itself held the mortgage stating: "We do not suggest that an assignment must be in recordable form at the time of the notice of sale or the subsequent foreclosure sale, although recording is likely the better practice. Where a pool of mortgages is assigned to a securitized trust, the executed agreement that assigns the pool of mortgages, with a schedule of the pooled mortgage loans that clearly and specifically identifies the mortgage at issue as among those assigned, may suffice to establish the trustee as the mortgage holder. **However, there must be proof that the assignment was made by a party that itself held the mortgage.**"[15]

218. If the Trustee fails to produce proper documentation that the defaulting mortgage was actually transferred into the pool and assigned to the end-holder before the initiation of foreclosure proceedings or at the close of the trust, the investor and insurers may have recourse against CITIBANK, STRUCTURED ASSET MORTGAGE INVESTMENTS, BEAR STEARNS AND BANK OF AMERICA as successor to COUNTRYWIDE and demand repurchase of loan for breaches of representations and warranties, indemnification, state a federal law violations, appraisal fraud, and other covered issues.

219. Payments for breaches may have already been exchanged as part of negotiated settlements or insurance claims between the parties without public disclosure. It is possible that the trust has obtained multiple recoveries on the same loan, or will receive multiple recoveries upon liquidation.

---

[15] http://newsandinsight.thomsonreuters.com/Bankruptcy/News/2011/07_-_July/AMBAC_$1_billion_subprime_lawsuit_vs_JPMorgan_revived/

220. Assuming *arguendo* the endorsement in blank on the Note was valid, or could be corrected when an original document was produced, an assignment in blank converts the note to bearer paper. If a mortgage note is endorsed in blank, then under the UCC it is payable to the bearer, which is the transferee to whom the mortgage note is delivered. Therefore the original note must be lodged with the Court for inspection.

221. So who is holding the original note? The securitization documents claim that a document custodian is holding it safe and secure in fire rated facilities. Then that party should come forward with the original for inspection.

222. Plaintiffs hereby demand said inspection for authenticity and until then denies that it is the original note. It is unclear if the note was ever delivered or if any party can produce it. To date, BOA has only produced a copy of the note and a set of unsigned preliminary documents, and mandatory disclosures.

223. *In re: Kemp v. COUNTRYWIDE Home Loans, Inc.* COUNTRYWIDE as servicer filed a proof of claim for a mortgage in a bankruptcy case on behalf of Bank of New York as trustee for a securitization trust. The bankruptcy court denied the claim because there was no evidence that Bank of New York ever owned the mortgage. The mortgage note had never been negotiated or delivered to Bank of New York, despite the requirement to do so in the Pooling and Servicing Agreement (PSA) that governed the securitization of the loan. That meant that Bank of New York as trustee had no interest in the loan, so the proof of claim filed on its behalf was disallowed.

224. The *Kemp* case exposed that the securitization transactions simply failed to be effective because non-compliance with the terms of the transaction: failure to properly transfer the mortgage meant that the mortgages were never actually securitized.

**Note and Mortgage Transfers in Securitizations**

225. A residential mortgage securitization is a transaction that involves a series of transfers of two types of documents: mortgage notes (the IOUs made by mortgage borrowers) and mortgages (the security instrument that says the lender may foreclose on the house if the borrower defaults on the note). Ultimately, both the notes and mortgages need to be properly transferred to a trust that will pay for them by issuing securities (backed by the mortgages and notes, hence residential mortgage-backed securities or RMBS). If the notes and mortgages are not properly transferred to the trust, then the securities that the trust issues aren't mortgage-backed and are worthless.

226. The critical issue is whether the notes and mortgages were properly transferred to the securitization trusts. To determine this, we need to figure out two things. First, what is the proper method for transferring the notes and mortgages, and second, whether that method was followed.

227. The methods for transfer are a negotiation of the notes per Article 3 of the Uniform Commercial Code (UCC) and a sale of the notes per Article 9 of the UCC (security interest, debtor, and secured party UCC 9-203 functions to affect a sale).

228. Notes *could be* transferred from, COUNTRYWIDE to BEAR STEARNS, and BEAR STEARNS to a trust. But that's not what happened with this securitization. A trust's powers are limited to those set forth in the documents that create the trust. In the case of RMBS, that document is the Pooling and Servicing Agreement (PSA). This particular PSA is governed by NY trust law, **which provides that a transaction beyond the authority of the trust documents is void,** meaning it is ineffective.

229. PSAs typically set forth a very specific method of transferring the notes (and mortgages) that goes beyond what is required by Articles 3 or 9. This is perfectly fine under the UCC, which permits parties to deviate from its default rules by agreement (UCC 1-203), which can be inferred from the parties' conduct, including the PSA itself. If a securitization transaction did not meet the requirements of the PSA, it is void, regardless of whether it complied with the

transfer requirements of Article 3 or Article 9. The private law of the PSA, not Article 3 or Article 9, is the relevant law governing the final transfer in a securitization transaction.

230. There is some variation among PSAs, but typically a PSA will have two relevant transfer provisions. First, it will have a recital stating that the notes (and mortgages) are "hereby" transferred to the trust. This language basically tracks the requirements of an Article 9 sale. Second, it will have a provision stating that in connection with that transfer, **there will be delivered to the trust the original notes, each containing a complete chain of endorsements that show the ownership history of the loan and a final endorsement in blank**. The endorsement requirement invokes an Article 3 transfer, but it imposes requirements (the complete chain of endorsements and the form of the final endorsement) that are not contained in Article 3.

231. There exists a very good business reason for having the full chain of title in the endorsements: it is evidence of the transfers needed to ensure the bankruptcy remoteness of the trusts' assets. Bankruptcy remoteness means that the RMBS investors are assuming only the credit risk on the mortgages, not the credit risk of the originators and/or securitizers of the mortgages, and RMBS are priced based on this expectation.

232. The promissory note sales provisions of Article 9 only went into effect in 2001 (in 49 states). While that language might have been sufficient for a common law sale, it wouldn't work for a transfer to a trust under NY law. When assets are transferred to a NY trust, there has to be actual delivery in as perfect a manner as possible; a "mere recital" does not cut it and frankly, endorsements in blank might not suffice either because there is nothing that indicates that something endorsed in blank is trust property, rather than the trustee's or someone else's.

233. As demonstrated in *Kemp,* the assignee lacked the endorsements that were required in the PSA. That means, as the Bankruptcy Court concluded, that the note was never transferred to the trust at the time the bankruptcy claim was filed. The Bankruptcy Court did not need to opine beyond that point, but it is a small step to recognizing **that if the loan was not transferred to the trust in the first place, it cannot be transferred now**.

234. PSAs contain numerous timeliness provisions about loan transfers, often related to ensuring favorable tax status for the trust. PSAs also require the transferred loans be performing (not in default).

235. All evidence from this foreclosure points to the lack of a chain of endorsements, actual possession of documents, and a fraud act (*i.e.* MERS' T. Sevillano assignment) to conceal all of those deficiencies.

236. In *Kemp* COUNTRYWIDE admitted that non-delivery was "customary." Lack of delivery; absent delivery, the note, even if sold, isn't enforceable against the debtor by the buyer per UCC 3-203. UCC Article 9 only applies to the sale of the note, not its enforceability against the debtor.

237. UCC § 3-301 the person entitled to enforce a note is (a)(1) the holder, (a)(2) a nonholder in possession of the note who has the rights of a holder, or (a)(3) a person not in possession but who has the right to enforce because the note is missing (§3-309) or another section which is not material herein.

238. UCC § 3-201 defines negotiation as transfer of possession to a person other than the issuer of the note. The transferee is a holder. If a note is payable to a specific person, negotiation requires both transfer of possession and endorsement by the named person. If the instrument is payable to bearer, transfer of possession is enough.

239. A note is payable to bearer if it is made out to bearer, or if it is indorsed in blank. Turning to § 3-301(a)(2), there is no definition of a "nonholder in possession of the instrument". In fact, that looks like a contradiction. We get the answer in the Official Comment to § 3-301: A nonholder in possession of an instrument includes a person that acquired rights of a holder by subrogation or under section 3-203(a). It also includes any other person who under applicable law is a successor to the holder or otherwise acquires the holder's rights.

240. Subrogation is not likely to be applicable. However, §3-203(a) is likely to be applicable:

§ 3-203. TRANSFER OF INSTRUMENT; RIGHTS ACQUIRED BY TRANSFER.

(a) An instrument is transferred when it is delivered by a person other than its issuer for the purpose of giving to the person receiving delivery the right to enforce the instrument.

(b) Transfer of an instrument, whether or not the transfer is a negotiation, vests in the transferee any right of the transferor to enforce the instrument, including any right as a holder in due course, but the transferee cannot acquire rights of a holder in due course by a transfer, directly or indirectly, from a holder in due course if the transferee engaged in fraud or illegality affecting the instrument.

(c) Unless otherwise agreed, if an instrument is transferred for value and the transferee does not become a holder because of lack of endorsement by the transferor, the transferee has a specifically enforceable right to the unqualified endorsement of the transferor, but negotiation of the instrument does not occur until the endorsement is made.

241. In this case at bar, a note with an original named payee, COUNTRYWIDE BANK may have been sold or negotiated to BEAR STEARNS but failed to transfer the documents. COUNTRYWIDE transferred the note to BEAR STEARNS but failed to endorse it. BEAR STEARNS is not a holder. However, under the provisions of § 3-203(c), CITIBANK as Trustee is entitled to get an endorsement from COUNTRYWIDE now BANK OF AMERICA (unless the parties agreed otherwise, which did not happen). In the mean time, CITIBANK as Trustee is entitled to enforce it by virtue of § 3-203(b), so long as it can produce the actual note. That has not happened in this case either. Plaintiff alleges the Note was destroyed and converted to an e-note.

242. When promissory notes are securitized, it would be a disaster if the makers of the notes, the property owners, were able to assert defenses against the new owner. The RMBS does not want to get into a lawsuit over consumer fraud. To protect themselves, securitizers structure transfers to insure that the trust holds notes as a holder in due course. That way, the trust is not exposed to claims of the property owner. The parties cannot pick and choose which provision

they want to say are legitimate that benefits them, and ignore other requirements to make the structure legitimate.

243. Holder in due course status is governed by § 3-302. A transferee obtains that status only if the promissory note a) is negotiated to a person who b) takes for value, in good faith, and without knowledge of the defenses of a party. In this case BSALT 2006-7 took the assignment with actual knowledge of the issues the Staggs had raised in RESPA qualified written request. They also took assignment for the sole purpose of foreclosure.

244. CITIBANK is not a holder in due course, because the note has not been negotiated, merely transferred. § 3-302 says that a person can only be a holder in due course if at the time the note is negotiated, the transferee has no notice of defenses of any party to the note.

245. COUNTRYWIDE cheated the Staggs and the Staggs demand that CITIBANK produce the note and a complete chain of assignments and transfers.

246. CITIBANK knows that the note has only been transferred, not negotiated. Any endorsement has obviously been done after the original document was filed with the County recorder, and to date the file produced by COUNTRYWIDE shows no assignments, allonges, or even endorsement in blank.

247. If CITIBANK as Trustee takes the note with notice of the defense to the note, it cannot be a holder in due course. The Staggs can pursue their claims against CITIBANK and BSALT 2006-7 trust. CITIBANK has also created an additional problem in that with actual knowledge of the lack of assignments, allonges, or endorsements, it ordered RECONTRUST to create the fraudulent MERS assignment executed by robo-signer T. Sevillano.

248. If COUNTRYWIDE did not endorse the note but merely transferred it, CITIBANK cannot negotiate the note without the signature of COUNTRYWIDE. In this case no endorsements have been found from COUNTRYWIDE BANK N.A. to any party.

**MERS**

249. The loan was purportedly registered in MERS for the purpose of tracking beneficial interest to the loan. While California courts have upheld the legitimacy of this business model, the true issue is not whether MERS is a legitimate way to track loans, the issue is did MERS actually accept and track the loans.

250. On the MERS system any transfer is initiated by the transformer and the transferee can accept or reject the transfer. A nominal fee of $4.95 is charged. The participants can not produce the MERS records as it would clearly show no assignment or transfers were tracked on the MERS system either.

251. Document exception reports created by the Trustee CITIBANK show missing and defective MERS assignments. This system is only as good as the participants entering the information. As with all the document problems which have been revealed in cases all across the country, the records of MERS are a mess.

252. MERS is simply an electronic database and its records are only as good as the person who entered them. Without testimony from that person, the records are suspect. On its website and in assorted court pleadings, it declares that it owns nothing. It was set up that way so that it would be "bankruptcy-remote," something required by the credit rating agencies in order to turn the mortgages passing through it into highly rated securities that could be sold to investors. MERS breaks the chain of title.

253. MERS claims in their own manual they cannot assign beneficial interest to any loan, and can only track it. In this case MERS purports to do exactly what they claim they cannot do, as T. Sevillano signs as Assistant Secretary for Mortgage Electronic Registration System transferring interest from MERS to CITIBANK N.A. as Trustee for the Certificate Holders of BEAR STEARNS Alt-A Trust 2006-7 on August 18, 2011.

254. Based on information and belief, T. Sevillano *did not* sign this document and had *no personal knowledge* of the contents of this document. Sevillano works for RECONTRUST and not MERS, BAC, Bank of America, CITIBANK, BEAR STEARNS, or BSALT 2006-7. She is a known robo-signer for RECONTRUST, MERS, and a wide variety of other organizations.

255. All of the documents concerning the Staggs real property that were recorded by the Defendants contain false statements or are otherwise groundless or invalid.

256. As a proximate result, there is a cloud on the Staggs title and they have been damaged financially in having to defend against the wrongful actions of Defendants in attempting to deprive them of their property.

257. The Staggs therefore seek a declaration under the authority of *Code of Civil Procedure* §760.020 that the title to the subject Property is vested in Marlon and Christine Staggs alone and that the Defendants herein, and each of them, their parents, subsidiaries, agents and assigns be declared to have no estate, right, title or interest in the subject Property and that said Defendants, and each of them, are forever enjoined from asserting any estate, right, title or interest in the subject property adverse to Marlon and Christine Staggs.

**Ownership of Certificates**

258. Only the beneficiaries — the investors who advanced the funds — can claim ownership. And the mortgages had to have been recorded in the name of the beneficiaries the year the MBS closed. Due to the fractional ownership of principal and interest, residual and excess stripped securities, and trigger events that resulted in liquidation of the trusts, the remaining true participants in interest are few.

259. Trigger events are set at inception based on the number of delinquencies and/or the credit enhancements (insurances) falling below a certain level. Once the trigger event occurs, the entire distribution model changes and the excess interest classes take losses one by one from the bottom classes up until they have suffered full loss and then they are closed. The principal of all loans paid off or liquidated after foreclosure is distributed to the CUSIP tranche it is pledged to.

260. In this case, the STAGGS loan is in GROUP 1 and pledged to tranche 1-A-1. The owner of this tranche is the only beneficiary of this loan principal or interest. Not the entire trust. The identity of this party has been concealed by the Trustee CITIBANK N.A. and the servicer BAC Property Loans Servicing. Matters such a loan modifications, and other issues have been put to vote and will reveal if CITIBANK is actually acting on the direction of those participants or not. In addition, lawsuits filed by investors clearly state that the investors and insurer are not in agreement that CITIBANK, BAC, BEAR STEARNS, have not acted in the best interest of these participants. All trust managers have a fiduciary duty to do what is in the best interest of the investors.

261. The Staggs deny that their actions caused any default on the loan and the participants did not have the right to declare a default or accelerate the note. BAC *asked* the Staggs to default on the loan as a condition precedent to assistance with the promise of assistance. Therefore the Staggs simply did what they were *asked* to do by the agent of the trust. (This is discussed more fully below under Count Nine – Violation of CAL. BUS. & PROF. CODE §17200).

262. The Staggs have already paid the full value of the property to COUNTRYWIDE BANK, BEAR STEARNS (all entities), and CITIBANK as agent for the Certificate holders of BSALT 2006-7 trust. In fact, these parties have taken interest that the Staggs paid to cover for other borrowers who were not paying and used the high interest to strip off and hold excess spread investment classes. It is not the Staggs fault that the parties did not pass through *all* the payments of interest paid to the investors who were promised the loan group this loan is pledge to.

263. CITIBANK as Trustee created a document exception report within 90 days of the trust closing and would have noted missing and defective documents for the unknown certificate holder beneficiaries. The parties claiming rights to enforce, ownership rights, or some right stemming from cash flow of the securities, knew the truth about the deficiencies of the loan, the concealment of true and complete terms of the loan from the borrower as the loan file clearly shows lack of disclosures-timing of disclosures and unsigned disclosures.

264. COUNTRYWIDE BANK, BEAR STEARNS (all entities), RECONTRUST, CITIBANK, BAC, and Bank of America, and unknown legal trust claimed as BSALT 2006-7, have all acted with unclean hands as fully set forth in this complaint. Acting as agents, and fiduciaries of this trust, all participants have failed to fulfill the fiduciary duty to investor and insurers, failed to meet condition precedent to acceleration of the note, and failed to follow all loss mitigation guidelines required by the trust contracts and insurer contracts.

265. COUNTRYWIDE failed to transfer the notes, mortgages, deed of trust, loan application, appraisal, disclosures, and in fact has lost all the paperwork required to show this loan was originated legally. This is clear in the unsigned documents and loan file produced by COUNTRYWIDE in response to the RESPA qualified written request.

266. Despite affirmative attestations in the BSALT 2006-7 pooling and servicing agreement, BEAR STEARNS failed to obtain the loan file and protect it, receive assignment from COUNTRYWIDE, or review the file for legitimacy of transaction.

267. The trust claims legal jurisdiction under New York trust law, which governs these securitizations, and BSALT 2006-7 has failed even the basic requirements. BSALT 2006-7 claims to be a legal entity, yet no business registration can be found. A trust can be an LLC, an LLP, a corporation, or any other business structure, and BSALT 2006-7 is not found.

268. COUNTRYWIDE, BEAR STEARNS, RECONTRUST, CITIBANK, BAC, and Bank of America, have transferred the loan to BSALT 2006-7 after default and years after the close of the trust contrary to IRS rules governing REMICs. All of these participants have taken advantage of the benefits of a pass through REMIC without actually following the requirements to be a REMIC. This renders BSALT 2006-7 a non-existent legal entity. The rules of the PSA prohibit transferring a defaulted loan to the trust therefore the transfer is not valid as the managers, BEAR STEARNS, BAC, Bank of America, CITIBANK cannot take any action that is contrary to the PSA, the governing document.

269. COUNTRYWIDE, BEAR STEARNS, RECONTRUST, CITIBANK, BAC, and BANK OF AMERICA have engaged in fabrication of documents and assignments with *actual* knowledge of the missing and defective documents. The Trustee CITIBANK, and the MBS owners, would have immediately discovered that the representations and warranties as to the quality of the conveyed paper were violated, as the Trustee was required to file a document exception report detailing all the missing and defective documents within 90 days of the trust closing. This exceptions report would have been communicated to all participants involved all the way back to originator, COUNTRYWIDE Home Loans Inc., under recourse agreements. In this case it is clear from the response to the RESPA qualified written request that many documents are missing and defective and that the participants knew of these document defects.

270. Missing and defective documents include: (1) signed initial good faith disclosures; (2) intervening disclosures when terms changed; (3) primary appraisal; (4) signed loan application; (5) signed affiliated business disclosures; (6) assignment to BSALT 2006-7 trust before closing date; (7) original note and deed of trust; (8) signed proof of received loan application disclosures issued within 3 days of closing; (9) signed borrower agreement to lock in rate; (10) signed application fee disclosure.

271. The missing disclosure documents in this case have a heightened significance as the Staggs were not at closing and instead had authorized a business manager to close the loan for them. Not only did the Staggs never receive the proper disclosures, the Staggs never received a signed set of these documents at closing for review. The lender does not have any of these documents; therefore it is clear they do not exist.

272. The "Trusts" coming to Court are actually Mortgage Backed Securities ("MBS"). BAC as servicer, and CITIBANK as Trustee are merely administrative entities for BSALT 2006-7.

**COUNT EIGHT**

**EQUITABLE ESTOPPEL**

**AS AGAINST BANK OF AMERICA, N.A. ("BOA"), COUNTRYWIDE FINANCIAL CORPORATION ("CFC"), COUNTRYWIDE HOME LOANS, INC. ("CHL"), AND COUNTRYWIDE HOME LOANS SERVICING, L.P. FKA BAC HOME LOANS SERVICING L.P., LANDSAFE TITLE INC., STRUCTURED ASSET MORTGAGE INVESTMENTS II INC. ("SAMI"), RECONTRUST, CITIBANK N.A., MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., DOES 1-10**

273. Plaintiffs hereby incorporate by reference each and every one of the preceding paragraphs as if fully set forth herein.

274. CITIBANK, BAC, Bank of America, RECONTRUST, MERS, BSALT 2006-7, and all mangers thereof, knew the truth of missing and defective documents, fraudulent assignments, inflated and collusive appraisals, and agency requirements to act as a fiduciary for the best interest of the investors and the insurers. They are *all* precluded, both at law and in equity, from denying, or asserting the contrary of, any material fact which, by his words or conduct, affirmative or negative, intentionally or through culpable negligence, he has induced another, who was excusably ignorant of the true facts and who had a right to rely upon such words or conduct, to believe and act upon them thereby, as a consequence reasonably to be anticipated, changing his position in such a way that he would suffer injury if such denial or contrary assertion was allowed. *28 Am Jur 2d Estoppel and Waiver § 28*

275. CITIBANK, BAC, Bank of America, RECONTRUST, MERS, Certificate holders for BSALT 2006-7, and all mangers thereof are all estopped, as they remained silent while using each other as a veil of secrecy to commit acts of fraud against the borrower, the investor and the insurers. All of these participants had both the duty and the opportunity to speak up or speak out against the prosecution of a foreclosure and enforcement of a legal obligation, as they had *actual* knowledge of an inflated appraisal, investor and insurer loss mitigation guidelines that were not followed, incomplete, missing and defective loan documents, and fraudulent assignments by robo-signer T. Sevillano, and defective MERS records. Their silence put the Staggs at a disadvantage.

276. An unknown certificate holder in an investment tranche that this loan's principal and interest is pledged to has remained silent though they hold a majority stake, and perhaps the only stake due to a liquidation structure, in the outcome of the propertyowners claims. Many tranches have already been reduced to zero through complete payouts. **SEE** EXHIBIT47 - JANUARY INVESTOR REPORT

277. If the participants did not inform each other of the breaches named above, the Staggs did. In RESPA letters the Staggs informed all of these participants of the issues and not one responded to correct or explain the deficiencies. The RESPA qualified written request were not answered timely or completely, and the participants offered no meaningful assistance.

278. Whether the participants engaged in silence by acquiescence, directly aided and abetted the fraud, or participated in active concealment, they are all acting as agents of the other under contractual agreements, so it makes no difference. Each are responsible for the acts of the other as joint tortfeasors. They were all confronted and remained silent thereby accepting or permitting the acts without protest or counterclaims thereby they lost the right to a claim of any loss or damage.

279. CITIBANK, BAC, Bank of America, RECONTRUST, MERS, BSALT 2006-7, certificate holders and insurers, and all mangers thereof are collateral estopped as the true participants in interest, investors and insurers have received monthly reports, exception reports, and made claims thereof, but affirmatively decided not to intervene or come forward in issues related to borrower litigation and foreclosure. These participants are in legal privity with the participants they have chosen to actually litigate the issues in dispute.

280. The holder of note, or non-holder with rights to enforce it, or the party holding the *actual* original note has failed to come forward and remained silent, therefore they are estopped from asserting any rights on their own behalf. Unconscionability by a breaching party is also

sufficient to estop the breaching party. Estoppel seeks to place a halt on the imbalance of the situation.

281. Investors and insurers had a duty to intervene. CITIBANK had a fiduciary duty to the investors and insurers. At no time did the investors or insurers seek to remove CITIBANK as Trustee and representative. Many lawsuits have been filed in New York expressing investor and insurer claims against BEAR STEARNS, CITIBANK, BAC, and BANK OF AMERICA for violations of ethical mandates of good faith and fair dealing, fraud and misrepresentations, servicing and foreclosure misconduct, and fraudulent assignments, these participants can't claim they did not know that problems existed. Yet, they chose not to intervene and assist the property owners who were the participants suffering the damages from the actions of their agents. Instead of intervening to resolve the conflicts, even after direct pleas, they chose to hide in the background to avoid liability themselves. The property-owners were at the mercy of their agents, and by ignoring all pleas for help, the investors and insurers allowed the escalation of damages to the Plaintiff, including but not limited to: emotional distress, loss of business, loss of credit and good name, and financial hardships of defending their property.

282. Where one person ('the representor') has made a representation of fact to another person ('the representee') in words or by acts or conduct, or (being under a duty to the representee to speak or act) by **silence or inaction**, with the intention (actual or presumptive) and with the result of inducing the representee on the faith of such representation to alter his position to his detriment, the representor, in any litigation which may afterwards take place between him and the representee, is estopped, as against the representee, from making, or attempting to establish by evidence, any averment substantially at variance with his former representation, if the representee at the proper time, and in proper manner, objects thereto.

283. A representation can be made by words or conduct. Although the representation must be clear and unambiguous, **a representation can be inferred from silence where there is a duty to speak or from negligence where a duty of care has arisen.**

284. **In this case, the participants should be collaterally stopped to save judicial resources as they** are litigating against each other and have already made claims and settled claims between each other and on behalf of the trusts concerning the issues presented. This court should demand all such claims pending or settled including; all insurance claims, margin calls paid, swap contracts liquidated, reserve and guarantee funds seized, stripped tranches in CDO's and net interest margin trusts liquidated, breaches of representations and warranties settlements, repurchase or other claims made against this loan and the loan trust fractional interest to avoid relitigation of issues of fact that have already been actually litigated or decided.

285. As the participants may seek a deficiency judgment, and may assign this right to a third party insurer, the Staggs should not have to defend against the same issues repeatedly.

286. The potential plaintiff's cannot sit and "test the waters" to see the strength of the Staggs case. There is great incentive for new participants to sue and claim that the defendant is estopped based on the prior adverse ruling or worse, wait and see if they might have liability before deciding whether or not to reveal themselves.

## COUNT NINE

## VIOLATION OF 15 U.S.C. 1641(F)(2) – TRUTH IN LENDING ACT AS AGAINST BANK OF AMERICA, N.A. ("BOA"), BAC HOME LOANS SERVICING L.P., STRUCTURED ASSET MORTGAGE INVESTMENTS II INC. ("SAMI"), CITIBANK N.A., WELLS FARGO, BEAR STEARNS ALT-A TRUST 2006-7 ("BSALT 2006-7"), DOES 1-10

287. Plaintiffs hereby incorporate by reference each and every one of the preceding paragraphs as if fully set forth herein.

288. The Staggs requested information under Title 15 §1641(f)(2) which provides - Upon written request by the obligor, the servicer shall provide the obligor, to the best knowledge of the servicer, **with the name, address, and telephone number of the owner of the obligation or the master servicer** of the obligation.

289. BANK OF AMERICA responded to this question after the Staggs asked for this information on September 29, 2011and again on October 23, 2011 (**SEE** EXHIBIT 35 & 38) stating WELLS FARGO (BSALT 2006-7). No address or telephone number was provided.

290. A second response came on November 4, 2011 and stated the full name: CITIBANK as Trustee for the Holders of BEAR STEARNS ALT-A Trust 2006-7, Mortgage Pass Through Certificates, Series 2006-7, 9062 Old Annapolis Rd. Columbia Md. 21045. However the address is not correct, it is that of WELLS FARGO, not CITIBANK, not MERS, and not the BSALT 2006-7 trust. No phone number was provided.

291. The RESPA letter that went to WELLS FARGO on October 23, 2011 was responded to by WELLS FARGO on January 26, 2012, and stated that they forwarded the letter to the servicer, Bank of America.

292. The Staggs had no idea what that meant as it was not the full and legal name of the trust, nor did it identify that WELLS FARGO was the master servicer of the trust. **SEE** EXHIBIT 41. The problem is the parties now claim MERS was the party in interest until August 18, 2011 (**SEE** EXHIBIT 20) This incorrect information prevented the Staggs from pursuing MERS for information regarding the loan.

293. The run around is clear and meant to make it difficult to locate and discuss the issues with the true parties in interest, the entire purpose of the RESPA and TILA statutes.

294. Thus, the Defendants violated 15 U.S.C. 1641(F)(2) and are subject to statutory damages, civil liability, attorneys' fees and actual damages. The actual pecuniary damages include, but are not limited to, the over calculation and overpayment of interest on Plaintiffs' loan, the costs of repairing Plaintiffs' credit, the reduction and/or elimination of Plaintiffs' credit limits, costs associated with removing the cloud on their property title, and attorneys' fee and

costs, in an amount to be proven at trial, but in excess of $75,000.

295. As a result of the Defendants' violation, Plaintiffs' home has fallen into foreclosure and they have suffered actual damages in that they are in the process of being foreclosed upon. Further, the Staggs have had to pay attorney's fees and filing fees and costs, both in an amount to be proven at trial.

296. Plaintiffs are entitled to a private right of action to enforce §131(g) U.S.C. §1641, *et. seq.*

**COUNT TEN**

**VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW – CAL. BUS. & PROF. CODE §17200 AS AGAINST BANK OF AMERICA, N.A. ("BOA"), COUNTRYWIDE FINANCIAL CORPORATION ("CFC"), COUNTRYWIDE HOME LOANS, INC. ("CHL"), AND COUNTRYWIDE HOME LOANS SERVICING, L.P. FKA BAC HOME LOANS SERVICING L.P., LANDSAFE TITLE INC., LANDSAFE APPRAISAL SERVICES INC., EDDIE AVAKIAN, C. BILL LEE- TC APPRAISALS, MARK HEARN, HEARN QUALITY ASSURANCE INC., OMRI MERON- MARTEL LOFTSLLC - OMRI MERON, AMI REAL ESTATE, INC., STRUCTURED ASSET MORTGAGE INVESTMENTS II INC. ("SAMI"), RECONTRUST, CITIBANK N.A., BEAR STEARNS ALT-A TRUST 2006-7 ("BSALT 2006-7"), MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. , DOES 1-10**

297. Plaintiffs hereby incorporate by reference each and every one of the preceding paragraphs as if fully set forth herein.

298. California *Business and Professions* Code §17200, *et. seq.* prohibits acts of unfair competition, which means and includes any unlawful, unfair or fraudulent business act and conduct that is likely to deceive and is fraudulent in nature. As more fully described above, Defendants' acts and practices are unlawful, fraudulent, and likely to deceive. The conduct is ongoing and continues to this date.

299. Defendants engage in unlawful, fraudulent and deceptive business practices with respect to mortgage loan servicing, assignment of note and deed of trust, and related matters by, amongst other things:

1. Executing and recording false and misleading documents;
2. Executing and recording documents without the legal authority to do so;
3. Failing to disclose the principal for which documents were being executed and recorded in violation of California *Civil Code* §1095;
4. Failing to record Powers of Attorney in connection with other recorded documents in violation of California *Civil Code* §2933;
5. Violating the Security First Rule;
6. Demand and accepting payments for debts that were non-existent;
7. Reporting payments as late to credit bureaus without the legal right or authority to do so;
8. Acting as a beneficiary without the legal authority to do so, and;
9. Other deceptive business practices as described herein.

300. Plaintiffs allege that by engaging in the above-described acts and/or practices as alleged herein Defendants have violated several California laws, including §131(g) 15 U.S.C. §1641, Cal. Penal Code 532 (f)(a)(4), and regulations and said predicate acts are therefore per se violations of California *Bus. & Prof. Code* §17200, *et. seq.*

301. More specifically on point, on or about June 30, 2009, the Staggs were intimated, if not expressly advised, by a servicing agent at BOA that they could not be considered for a loan modification unless they were behind on their mortgage payments.

302. On the above basis, the Staggs began to default on their loan, which, eventually, led to the present foreclosure they are now facing.

303. In short, BAC Home Loan Servicing and Bank of America's immoral, unethical, oppressive, unscrupulous and substantially injurious conduct has harmed Plaintiffs in an amount

to be proven at trial.

304. By reason of the foregoing, Defendants have been unjustly enriched and should be required to disgorge their illicit profits and/or make restitution to Plaintiffs and other California consumers who have been harmed, and/or be enjoined from continuing in such practices pursuant to Cal *Bus. & Prof. Code* §§17203 and 17204. Additionally, Plaintiffs are therefore entitled to injunctive relief and attorneys' fees as available under Cal. *Bus. & Prof. Code* §17200 and related sections.

**COUNT ELEVEN**

**APPRAISAL VIOLATIONS**

**AS AGAINST LANDSAFE APPRAISAL SERVICES, INC. & LANDSAFE, INC.**

305. Plaintiffs hereby incorporate by reference each and every one of the preceding paragraphs as if fully set forth herein.

306. Mark Hearn ("HEARN") and C. Bill Lee ("LEE") acting as agents of LANDSAFE Appraisal Services ("LANDSAFE") did not conduct the appraisal in compliance with California Administrative Code, Title 10, section 3701 states in relevant part that "Every holder of a license under this part shall conform to and observe the Uniform Standards of Professional Appraisal Practice (USPAP)..." The California Real Estate Bulletin dated Fall October 2006 relying on California Administrative Code Title 10, section 3701 states that "All licensed appraisers are required to conform to the requirements of the [USPAP].

307. Hearn and Lee acting as agents of LANDSAFE did not conduct an independent or impartial appraisal on the Staggs property as required under FIRREA and the standards of Uniform Standards of Professional Appraisal Practice (USPAP) promulgated by the Appraisal Standards Board of the Appraisal Foundation, California *Business and Professions Code*. Division 4, Part 3, Sections 11300 *et seq*., or California *Code of Regulations* Title 10, Chapter 6.5, Sections 3500 *et seq*. (A) Appraisal (4) Shall conform to USPAP, particularly Standards Rules 1 and 2.

308. Hearn and Lee acting as agents of LANDSAFE did not conduct the appraisal in compliance with the conduct section of the Ethics Rule in USPAP that states 'An appraiser must not accept an assignment that includes the reporting of predetermined opinions and conclusions.' In addition, each appraisal report must contain a certification signed by the appraiser, stating that his or her compensation for completing the assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client."

309. Hearn and Lee acting as agents of LANDSAFE did not conduct the appraisal in compliance with Uniform Standards of Professional Appraisal Practice ("USPAP"), requires appraisers to conduct their appraisals independently - "An appraiser must perform assignments with impartiality, objectivity, and independence, and without accommodation of personal interests. In appraisal practice, an appraiser must not perform as an advocate for any party or issue."

310. Further, 12 *Code of Federal Regulations* Section 34.45 states in part that "the appraiser shall be engaged directly by the regulated institutions or its agent, and have no direct or indirect interest, financial or otherwise, in the property transactions."

311. The Federal Office of Thrift Supervision provides for appraisal independence as set forth in Title 12, *Code of Federal Regulations*, Section 564.5.

312. The USPAP requires that a State certified or State licensed appraiser may not accept a fee for an appraisal assignment that is contingent upon the appraiser reporting a predetermined estimate, analysis, or opinion or is contingent upon the acceptance of a fee for an appraisal assignment that is contingent upon the appraiser reporting a predetermined estimate, analysis, or opinion or is contingent upon the opinion, conclusion or valuation reached, or upon the consequences resulting from the appraisal assignment.

313. Under Title XI of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA) (Pub. L. No. 101-73, 103 Stat. 183 (1989)), 12 U.S.C. 3310, 3331-3351, and section 5(b) of the Bank Holding Company Act, 12 U.S.C. 1844(b), it is a crime for anyone to

willfully overvalue any land or property, or knowingly make any false statement, for the purpose of influencing federally insured mortgage lenders and other financial institutions (18 U.S.C. § 1014).

314. Hearn and Lee acting as agents of LANDSAFE had a fiduciary duty, implied trust and confidence with the Staggs regarding the appraisal as stated in 3702(a)(1), and each under 3705 bears full personal responsibility for the accuracy, content and integrity of the appraisal under the Standards Rules 1 and 2 of USPAP. As stated in 3702(a)(1), and under 3705, the Appraiser bears full personal responsibility for the accuracy, content and integrity of the appraisal under the Standards Rules 1 and 2 of USPAP.

315. Hearn and Lee acting as agents of LANDSAFE did not act as an independent appraiser or in a fiduciary capacity to the Staggs.

316. California *Business and Professions Code*, Division 4, Part 3, Sections 11300 *et seq*. 11302. (b) "Appraisal" means a written statement independently and impartially prepared by a qualified appraiser setting forth an opinion in a federally related transaction as to the market value of an adequately described property as of a specific date, supported by the presentation and analysis of relevant market information.

317. California *Business and Professions Code* §11323 further states that No licensee shall engage in any appraisal activity in connection with the purchase, sale, transfer, financing, or development of real property if his or her compensation is dependent on or affected by the value conclusion generated by the appraisal. *See also,* California *Code of Regulations* (A) Appraisal (4) shall conform to USPAP, particularly Standards Rules 1and 2.

318. California Administrative Code, Title 10, section 3702 (a)(1) states that the "profession of real estate appraisal is vested with a fiduciary relationship of trust and confidence as to clients, lending institutions, and both public and private guarantors or insurers of funds in federally-related real estate transactions and that the qualifications of honesty, candor, integrity

and trustworthiness are directly and substantially related to and indispensable to the practice of the appraisal profession.

319. Due to the above appraisal violations, Plaintiffs allege that their consent to the loan agreements referenced herein were not free and mutual, due to the fraud of all Defendants and each of them. Plaintiffs allege that, as a result, and under *Civil Code* §§ 1566, 1689(b)(1) and 1689(b)(7), the loan agreements are voidable as between Plaintiffs, on one hand, and COUNTRYWIDE BANK, BSALT 2006-7 trust ("Lending Defendants"), on the other hand.

**COUNT TWELVE**

**INJUNCTIVE RELIEF**

**AS AGAINST BANK OF AMERICAN.A. ("BOA"), STRUCTURED ASSET MORTGAGE INVESTMENTS II INC. ("SAMI"), RECONTRUST, CITIBANK N.A., BEAR STEARNS ALT-A TRUST 2006-7 ("BSALT 2006-7"), CERTIFICATE HOLDERS OF BSALT 2006-7, MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., DOES 1-10**

320. Plaintiffs hereby incorporate by reference each and every one of the preceding paragraphs as if fully set forth herein.

321. California courts are unanimous and courts of appeal have considered unclean hands in both tort and contract actions. [16] While earlier opinions carefully considered whether to

[16] Camp v. Jeffer, Mangels, Butler & Marmaro, 41 Cal. Rptr. 2d 329, 340 (Ct. App. 1995) ("In California, the doctrine of unclean hands may apply to legal as well as equitable claims and to both tort and contract remedies."

apply the defense on a claim–by–claim basis, later opinions broadly echo its applicability in all cases.[17]

322. In this case the unclean hands should be applied to the claims that sound in equity, tort, and contract. The foreclosure is an attempt at the final conversion of the property, and should be precluded. BAC, CITIBANK, BSALT 2006-7, and RECONTRUST all are engaging in malicious prosecution and legal malpractice using known fraudulent documents. Unclean hands is absolute bar to foreclosure.

323. California has long recognized the maxim that "No one can take advantage of his own wrong." (Civ. Code. § 3517.) Put another way, "[h]e who comes into equity must come with clean hands." (See *Wilson v. S.L. Rey, Inc.* (1993) 17 Cal. App.4th 234, 244; *Kendall-Jackson Winery, Ltd v. Superior Court* (1999) 76 Cal. App.4th 970, 978.) The doctrine promotes justice by making a plaintiff answer for its own misconduct in the action. It prevents "a wrongdoer from enjoying the fruits of his transgression." [Citation omitted.] [At p.p. 978-970.]

324. Under the doctrine of unclean hands, "a plaintiff [must] act fairly in the matter for which he seeks a remedy. In this case BAC, CITIBANK, BSALT 2006-7, and RECONTRUST did not come into court with clean hands, and the Staggs should be afforded injunctive relief. At least one recent case suggests the defense of unclean hands may be submitted to the jury. (*Fuller-Austin Insulation Company v. Highlands Insurance Company* (2006) 135 Cal.App.4th 958, 974.)

(internal citation omitted)) Decisions have made the defense available to preclude conversion, malicious prosecution, and legal malpractice, as well as to bar the foreclosure of a mechanic's lien.

[17] *Compare* Gen–Probe, Inc. v. Amoco Corp., 926 F. Supp. 948, 952 (S.D. Cal. 1996) (applying California law) (declaring the defense available to bar legal conversion claims in reliance on *Unilogic*, 12 Cal. Rptr. 2d, at 745–748), *with* Alan Klarik Enters., Inc. v. Viva Optique, Inc., No. B179607, 2006 WL 2423552, at *5 (Cal. Ct. App. Aug. 23, 2006) ("[U]nclean hands applies not only to actions seeking equitable relief, but applies as well today as a defense to legal actions."), Travel Am., Inc. v. Camp Coast To Coast, Inc., Nos. G028513, G028738, 2003 WL 558563, at *4 (Cal. Ct. App. Feb. 27, 2003) (unclean hands operates as a bar to the entire lawsuit asserting legal and equitable claims), *and* Kendall–Jackson Winery, Ltd. v. Superior Court, 90 Cal. Rptr. 2d 743, 749 (Ct. App. 1999) ("The defense is available in legal as well as equitable actions." (citations omitted)).

325. In this case, BAC, CITIBANK, BSALT 2006-7, and RECONTRUST's inequitable conduct in connection with the matter in controversy provides a complete defense to the plaintiff's action. (*Dickson, Carlson & Campillo v. Pole* (2000) 83 Cal. App. 4th 436, 446.)

326. The inequitable conduct constituting unclean hands includes:

1) COUNTRYWIDE's collusion with the developer/builder to take away the Staggs right to shop for a loan, and to create a coercive, collusive inflated appraisal through wholly owned subsidiary LANDSAFE.
2) BAC Property Loans Servicing demands that the Staggs default to secure assistance, and subsequent promises of loan modification with no intent to ever perform on that promise.
3) BAC and CITIBANK's ordering of fraudulent robo-signed documents with *actual* knowledge of missing and defective documents on their own exception reports.
4) RECONTRUST's execution of COUNTRYWIDE's foreclosure with *actual* knowledge of fraudulent robo-signed assignment documents.

327. All of the afore-mentioned participants failed to stop all activities outlined herein when notified directly of such issues in a direct RESPA sent certified to them. **SEE** EXHIBITS 35 AND 38.

328. California Courts have long recognized that fraud in the underlying transaction or other inequitable conduct bars relief. Conduct is sufficient to constitute unclean hands if it "violates conscience, or good faith, or other equitable standards of conduct." (*Id.*) The doctrine of unclean hands also applies to bad faith conduct by the plaintiff in connection with the matter

in controversy. (*Fladeboe v. American Isuzu Motors, Inc.* (2007) 150 Cal.App.4th 42, 56.) The defense is based upon misconduct in the particular transaction or connected with the subject matter of the litigation. (*Wilson v. S.L. Rey, Inc.*, *supra*, 17 Cal. App.4th at 244.)

329. Here, the contract was void at inception due to fraud and collusion between the MARTEL LOFTS LLC- Omri Meron, AMI REAL ESTATE, INC., COUNTRYWIDE, and COUNTRYWIDE'S captive appraisal subsidiary LANDSAFE Appraisal Services Inc.

330. The Staggs have paid already paid full value based on the *true* value without collusion and a scheme to defraud that was executed by COUNTRYWIDE BANK N.A., COUNTRYWIDE HOME LOANS Inc., LANDSAFE Appraisal Services Inc., and builder/developer MARTEL LOFTS LLC. Therefore tender has already been given. 15 USC 1635(b) states "Upon the performance of the creditor's obligations under this section the obligor shall tender the property to the creditor, except that if return of the property in kind would be impracticable or inequitable, the obligor shall tender its reasonable value.

331. The assignment to the BEAR STEARNS Alternative Loan Trust 2006-7 never occurred. The investors have never been harmed and have been paid all pass through interest promised and receive no more interest if the Staggs had paid 8% or 2%. **SEE** EXHIBIT 47 – Active tranches I-A-1 CUSIP 073875AA4 and **SEE** EXHIBIT 46 Page 51 -FORENSIC AUDIT SPREAD TEST.

332. The investors *actually* already received over 317% in excess interest distributions

that were used to pay for other borrower's defaults. The investors, per contract, were only promised LIBOR plus a small margin. The central banks have driven LIBOR to near zero and have announced plans to keep it at that level through 2014.[18] With the current liquidation model the trust will dissolve before 2014 therefore the investors will not benefit from this loan any more than the current pass through rate of .46360%. Liquidation will cost them close to 60% on California loans. **SEE** EXHIBIT 47 Page 34 -Loss Severity 54%.

333. In this loan trust many California loans are delinquent more than 4 years, yet the Staggs have been singled out after less than one year for foreclosure. **SEE** EXHIBIT 47 Pages 18-19.

334. In this loan trust many borrowers have been given loan modification more than once and yet the Staggs were not even given one opportunity. **SEE** EXHIBIT 47 Pages 43-65.

335. In this loan trust borrowers who were not delinquent were given loan modifications yet BANK OF AMERICA ordered the Staggs to default to be considered for a loan modification. **SEE** EXHIBIT 47 Page 42.

**COUNT THIRTEEN**

**VIOLATION OF THE REAL ESTATE SETTLEMENT PROCEDURES ACT – 12 U.S.C. §2601 *ET. SEQ.* and FEDERAL RESERVE REGULATION X, 24 CODE OF**

[18] http://www.standardandpoors.com/ratings/articles/en/us/?articleType=HTML&assetID=1245328100410

**FEDERAL REGULATIONS §3500 *ET. SEQ.***

**AS AGAINST BANK OF AMERICA, N.A. and BAC HOME LOANS SERVICING, LP**

336. Plaintiffs hereby incorporate by reference each and every one of the preceding paragraphs as if fully set forth herein.

337. The underlying loan is a federally related mortgage loans as defined in the Real Estate Settlement Procedures Act ("RESPA") and implemented by Regulation X, which are broad in terms of their representation.

338. COUNTRYWIDE BANK and COUNTRYWIDE Home Loans failed to make available for inspection by Plaintiffs at or before the settlement the form required under 12 U.S.C. §2603 (HUD-1, Uniform Settlement Statement).

339. BANK OF AMERICA has failed to respond properly or timely to the Staggs' letters as required pursuant to Title 12 § 2605(e)(A). BANK OF AMERICA had a duty to respond as required under Title 12 §2605 (2)(A)(B)(C) which they did not do.

340. Specifically, on September 29, 2011, the Staggs sent a Qualified Written Request ("QWR") letter to Bank of America. **SEE** Exhibit 35.

341. The QWR contained information to enable BANK OF AMERICA to identify Plaintiffs' loan and also contained requests for information of the loan, specifically the identity

and contact information of the creditor of Plaintiff's Note, a full accounting of all funds and an advisement that BANK OF AMERICA was never authorized to include property tax within the monthly payment structure, which it was doing.

342. BANK OF AMERICA did not acknowledge the receipt of Plaintiffs' QWR within five days of receipt, as required by Dodd-Frank Act, nor fully answer within 30 days.

343. Because the loan is subject to RESPA, the Dodd-Frank Act, and Regulation X, all Defendants were required to comply with the Dodd-Frank Act.

344. Defendants violated Section 6 of Regulation X upon receipt of Plaintiffs' QWR by their actions including, but not limited to: (a) failure to make appropriate corrections in the account of the borrower, including the crediting of any late charges or penalties, and transmitting to the borrower a written notification of the correction; and (b) failure to protect Plaintiffs' credit rating upon receipt of Plaintiffs' QWR by furnishing adverse information regarding payment to credit reporting agencies as defined in §603 of the Fair Credit Reporting Act, 15 U.S.C. §1681(a).

345. BANK OF AMERICA and BAC Home Loans Servicing, LP violated 12 U.S.C. §2605 and the Dodd-Frank Act and subject to statutory damages, civil liability, penalties, attorneys' fees and actual damages. *See* 12 U.S.C. §2605 and the Dodd-Frank Act.

346. The actual and pecuniary damages include, but are not limited to, the over calculation and overpayment of interest on Plaintiffs' loan, the costs of repairing Plaintiffs' credit,

the reduction and/or elimination of Plaintiffs' credit limits, costs associated with removing the cloud on their Property title and setting aside the trustee's foreclosure proceedings, and attorneys' fees and costs, in an amount to be proven at trial.

**COUNT FOURTEEN**

**DOE DEFENDENTS 1-10**

347. Plaintiffs allege that each defendant, including those sued herein as Does 1-10, were acting as an agent or representative of every other defendant in doing all of the acts described in this Complaint and at all times was acting within the course and scope of such agency or representative capacity in doing the acts described herein.

**ALTER-EGO, AIDERS, ABETTORS, AGENTS AND CO-CONSPIRATORS**

348. At all times mentioned herein, a unity of interest and ownership existed among defendants; COUNTRYWIDE BANK N.A., COUNTRYWIDE Home Loans Inc., LANDSAFE Appraisals, LANDSAFE Title, BANK OF AMERICAN.A., BAC Home Loans Servicing and MERS, such that the separateness of these individual defendants from the business entities never existed.

349. Defendants, and each of them, to this complaint are sued as participants and/or aiders and abettors in the wrongful activities complained of herein, and the liability of each arises

from the fact that each has engaged in all or part of the improper acts, plans, schemes or transactions, which operated a fraud against Plaintiffs.

350. Plaintiffs are informed and believe, and based thereon allege, that at all times relevant the defendants, and each of them, had knowledge of the acts and conduct complained of herein and participated in the furtherance of the fraudulent acts, as more fully set forth below. Defendants, and each of them, have participated in some manner as members of the conspiracy or acted with or in furtherance of it, or aided or assisted in carrying out the fraudulent purposes alleged in this Complaint, and have performed acts and made statements or representations in furtherance of the conspiracy and/or the wrongful acts and in so doing aided and abetted the fraudulent conduct of the other Defendants named herein.

351. At all relevant times, each defendant was and is the agent of each of the remaining defendants and, in doing the acts alleged herein, was acting within the course and scope of such agency. Each defendant ratified and/or authorized the wrongful acts of each of the other defendants.

**PRAYER FOR RELIEF**

352. For compensatory, special, and general damages in an amount according to proof at trial, but not less than $5,000,000.00 against all Defendants;

353. For punitive and exemplary damages in an amount to be determined by the Court against all Defendants;

354. For an order deeming Plaintiffs' Promissory Note as unsecured;

355. For an order compelling Defendants to remove any instrument which does or could be construed as constituting a cloud upon Plaintiff's title to the Property, including the purported Notice of Default, Notice of Trustee's Sale, Substitution of Trustee, Trustee's Deed Upon Sale, and Assignment of Deed of Trust;

356. For an order finding that Defendants have no legally cognizable rights as to Plaintiffs, the Property, Plaintiffs' Promissory Note, Plaintiffs' Deed of Trust, or any other matter based on contract or any of the documents prepared by Defendants, tendered to and executed by Plaintiffs;

357. The Court issue an order restraining Defendants, their agents or employees from continuing or initiating any action against the Property and enjoining Defendants, their agents or employees from doing so during the pendency in this matter;

358. For an order compelling Defendants to disgorge all amounts wrongfully taken by them from Plaintiffs and returning the same to Plaintiffs with interest thereon at the statutory rate from the date the funds were first received from Plaintiffs;

359. For an order quieting title in favor of Plaintiffs;

359. For an order quieting title in favor of Plaintiffs;

360. For costs of suit incurred herein;

361. For reasonable attorneys' fees incurred;

362. For such other and further relief as the court may deem proper.

Dated: February 3, 2012

LAW OFFICES OF STEVEN IBARRA

By: ______________________

Steven Ibarra
ATTORNEYS FOR Plaintiffs
Marlon Staggs and Christine Staggs

**VERIFICATION**

I, MARLON STAGGS, am a Plaintiff in the above-entitled action. I have written and prepared the foregoing Complaint, and know the contents thereof. The same is true of my own knowledge in substance and in fact, except as to those matters that are therein alleged on information, and as to those matters, I believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed at Whittier, California.

DATED: February 3, 2012.

M. Staggs

Marlon Staggs, Plaintiff

**VERIFICATION**

I, CHRISTINE STAGGS, am a Plaintiff in the above-entitled action. I have written and prepared the foregoing Complaint, and know the contents thereof. The same is true of my own knowledge in substance and in fact, except as to those matters that are therein alleged on information, and as to those matters, I believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed at Whittier, California.

DATED: February 3, 2012.

Christine Staggs, Plaintiff

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing SUMMONS **AND COMPLAINT** has been FILED with the U.S. District Court for the District of Los Angeles, and furnished via [U.S. Certified Mail Return Receipt Requested] to the following Defendants:

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.
Registered Agent: SHARON HORSTKAMP
MERSCORP INC 1818 LIBRARY STREET STE 300
RESTON VA 20190

RECONTRUST COMPANY, N.A.
1800 Tapo Canyon Rd.
SIMI VALLEY, CA 93063
**2380 Performance Drive**
**Mailstop: TX2-984-04-07**
**Richardson, TX 75082,**
Registered Agent: Not on file

CITIBANK, N.A.
388 Greenwich Street 14th Floor
New York NY 10013.

LANDSAFE, INC.
LANDSAFE TITLE INC
The Prentice-Hall Corporation System, INC.
2730 Gateway Oaks Dr. STE 100
Sacramento, CA 95833

LANDSAFE APPRAISAL SERVICES INC.
**C T CORPORATION SYSTEM**
818 W 7TH ST LOS ANGELES, CA 90017-3407

BANK OF AMERICA, N.A.
**CT CORPORATION SYSTEM**
818 W SEVENTH ST
LOS ANGELES CA 90017.

BANK OF AMERICA CORPORATION
**CT CORPORATION SYSTEM**
818 W SEVENTH ST
LOS ANGELES CA 90017.

BAC HOME LOAN SERVICING LP
7105 Corporate Drive
Plano, Texas 75024
100 North Tyron Street
Charlotte, NC 28255

HEARN QUALITY ASSURANCE
MARK HEARN
400 Cover Street, Suite 100,
Long Beach CA 90808

TC APPRAISALS
C. BILL LEE
12931 Venice Blvd.
Los Angeles CA 90066

OMRI MERON
MARTEL LOFTS LLC
**AMI REAL ESTATE, INC**
BY AGENT: AMIR HABER
8342 1/2 West 3rd Street Suite A
Los Angeles CA 90048

STRUCTURED ASSET MORTGAGE INVESTMENTS II, INC.
BEAR STEARNS ALT-A TRUST 2006-7
CT CORPORATION SYSTEM
111 8TH AVE 13TH FLR NEW YORK,
NEW YORK, 10011

WELLS FARGO BANK, NATIONAL ASSOCIATION
Corporation Service Company
380 Jackson St. #700
St Paul MN 55101
Attention: BEAR STEARNS Alt-A Trust 2006-7
File Number 3762

Dated: ______________________, 2012.

______________________________

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Percy Anderson and the assigned discovery Magistrate Judge is Victor B. Kenton.

The case number on all documents filed with the Court should read as follows:

**CV12- 1002 PA (VBKx)**

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

---

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

[X] **Western Division**
**312 N. Spring St., Rm. G-8**
**Los Angeles, CA 90012**

[_] **Southern Division**
**411 West Fourth St., Rm. 1-053**
**Santa Ana, CA 92701-4516**

[_] **Eastern Division**
**3470 Twelfth St., Rm. 134**
**Riverside, CA 92501**

Failure to file at the proper location will result in your documents being returned to you.

Name & Address:
STEVEN IBARRA, ESQ. (SBN: 249642)
LAW OFFICES OF STEVEN IBARRA
6518 GREENLEAF AVENUE, SUITE 28
WHITTIER, CA 90601
(562) 735-0828 - (714) 582-0948 facsimile

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

MARLON STAGGS;
CHRISTINE STAGGS

PLAINTIFF(S)

v.

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.; RECONTRUST COMPANY, N.A.;COUNTRYWIDE FINANCIAL CORPORATION;COUNTRYWIDE HOME LOANS,INC.; COUNTRYWIDE HOME LOANS SERVICING, L.P. FKA BAC HOME LOAN SERVICING, L.P.; BANK OF AMERICA, N.A.;

DEFENDANT(S).

CASE NUMBER

CV12-1002 PA (VBKx)

**SUMMONS**

TO: DEFENDANT(S): BAC HOME LOANS SERVICING L.P.;EDDIE AVAKIAN;LANDSAFE APPRAISAL SERVICES INC.; LANDSAFE, INC; HEARN QUALITY ASSURANCE;MARK STEARN;TC APPRAISALS;C.BILL LEE; MARTEL LOFTS LLC;OMRI MERON;AMI REAL ESTATE,INC.;CITIBANK,N.A.;CERTIFICATE-HOLDERS OF BEAR STEARNS ALT-A TRUST 2006-7 AS A SEPARATE UNKNOWN LEGAL ENTITY; STRUCTURED ASSET MORTGAGE INVESTMENTS II,INC.; WELLS FARGO BANK, NATIONAL ASSOCIATION AND DOES 1-10

A lawsuit has been filed against you.

A LAWSUIT HAS BEEN FILED AGAINST YOU

Within 21 days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ ____________ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff's attorney, LAW OFFICES OF STEVEN IBARRA, whose address is 6518 GREENLEAF AVENUE, SUITE 28, WHITTIER, CA 90601. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: FEB - 6 2012

By: [signature]
Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*